**Clark CLIFFORD, Secretary of Defense, et al., Appellants,**

**v.**

**Dexter C. SHOULTZ, Appellee.**

**No. 23005.**

United States Court of Appeals
Ninth Circuit.

June 27, 1969.

Robert L. Keuch (argued), J. Walter Yeagley, Asst. Atty. Gen., Kevin T. Maroney, Atty., Dept. of Justice, Washington, D. C., Cecil F. Poole, U. S. Atty., San Francisco, Cal., for appellants.

Paul N. Halvonik (argued), Marshall W. Krause, San Francisco, Cal., for appellee.

Before JERTBERG, ELY and HUFSTEDLER, Circuit Judges.

ELY, Circuit Judge:

Lockheed Missiles and Space Company employed Shoultz, in 1960, to perform work requiring a "Secret" security clearance. His duties, since 1966, involved computer programming. In June of 1966, Lockheed requested him to participate in an interview concerning his security clearance. He refused. Subsequently, the Screening Board of the Office of the Assistant Secretary of Defense (Administration) informed Shoultz that it possessed new information which might affect his continued eligibility for a security clearance and that a personal interview would assist the Board in the performance of its responsibility to determine whether his continued access to secret information was consistent with the national interest. The Board advised Shoultz's counsel that Shoultz would be asked "questions relating to matters germane to his eligibility for a clearance" and that "[i]n particular, the Board desires that he be questioned in order to determine the extent of his participation in Cuban affairs." The Board also announced that Shoultz would be allowed to make a statement in his own behalf, to be represented by counsel, and to refuse to answer any questions on constitutional or other grounds. The Board warned, however, that the procedures set forth in Department of Defense Directive (DD) 5220.6 § V (B)[1] controlled and that, ac-

cordingly, Shoultz's refusal to answer could result in the suspension of his security clearance and the discontinuation of further proceedings.

Shoultz appeared for his interview on June 30, 1967. He answered the initial questions asking his name, employer, and home address, but his counsel objected to all other questions on the ground that they were "incompetent, irrelevant, and immaterial." The unanswered questions included the following:

"Now, Mr. Shoultz, have you ever visited the country of Cuba?"

"Mr. Shoultz, have you ever had any type of contact with any person or persons whom you knew or believed to be representatives of the Castro Government of Cuba?"

"Mr. Shoultz, have you ever had any type of contact with any person or persons whom you knew or believed to be a representative or employee of Radio Havana?"

"Mr. Shoultz, have you ever had any type of contact with any person or persons whom you knew or believed to be a member of the Communist Party in Cuba?"

"Mr. Shoultz, have you ever had any type of contact with the organization known as the Fair Play for Cuba Committee"

"Mr. Shoultz, have you ever had any type of communications with individuals working in or any department of Radio Havana?"

"Mr. Shoultz, have you ever received any messages from persons whom you know or believed to be representatives of the Castro Cuban Government"

"Mr. Shoultz, have you ever listened to Radio Havana broadcasts?"

As a result of Shoultz's refusal to answer the questions addressed to him during the interview, the Board notified him that it had been deprived of essential information for the determination of his continued eligibility for a security clearance and that his clearance was sus-

---

1. Section V(B) is reprinted in the text of the opinion, *infra*.

pended until such time as he might make application to the Office of the Assistant Secretary of Defense and receive a favorable determination. Lockheed then placed Shoultz on a "prolonged leave of absence" until the matter of his security clearance could be settled, and Shoultz instituted suit in the Court below.

The District Court, considering that it had "exposed serious constitutional problems," enjoined the Government from suspending Shoultz's security clearance under section V (B) of the Defense Directive, DD 5220.6. Shoultz v. McNamara, 282 F.Supp. 315 (N.D. Cal.1968). Relying heavily on Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959), the court, while avoiding decision on the constitutional issues, struck down the Directive's procedure for its lack of specific authorization by the President or Congress. The Government has appealed, invoking our jurisdiction under 28 U.S.C. § 1291.

We have concluded that the procedures contemplated by DD 5220.6, including § V (B) insofar as this regulation is considered in our opinion below, are consistent with due process of law and are within the authority delegated by the President and the Secretary of Defense. Accordingly, we reverse.

## DELEGATION OF AUTHORITY

■ At the outset we have reviewed the teaching of the Supreme Court in Greene v. McElroy, *supra*, wherein the Government attempted to revoke the security clearance of an aeronautical engineer whose industrial employment depended on the clearance. The Government Boards which were concerned with that case based their action on certain confidential reports which the employee at no time had an opportunity to examine. Moreover, the procedures did not allow the employee any opportunity for cross-examination of adverse witnesses. 360 U.S. at 479–480, 485–490, 79 S.Ct.

1400. The Court held that those particular industrial security clearance procedures were too much opposed to our traditional notions of the rights of confrontation and cross-examination. Finding no Congressional or Presidential authorization for the unusual procedures, the Court avoided the necessity of reaching constitutional issues. We read, at 506–507, 79 S.Ct. at 1419:

"We deal here with substantial restraints on employment opportunities of numerous persons imposed in a manner which is in conflict with our long-accepted notions of fair procedures. Before we are asked to judge whether, in the context of security clearance cases, a person may be deprived of the right to follow his chosen profession without full hearings where accusers may be confronted, it must be made clear that the President or Congress, within their respective constitutional powers, specifically has decided that the imposed procedures are necessary and warranted and has authorized their use."

Accommodating to the Supreme Court's decision in *Greene*, President Eisenhower, on February 24, 1960, issued Executive Order 10,865, 25 Fed.Reg. 1583, entitled Safeguarding Classified Information Within Industry. *See*, Exec. Order No. 10,865, *as amended*, 3 C.F.R. 512 (1968). This Order precludes the final denial or revocation of an individual's security clearance until he has been afforded the following procedural safeguards: (1) a written statement of the reasons why access to classified information may be denied; (2) opportunity to reply in writing; (3) opportunity for a hearing after the filing of a written reply to the statement of reasons; (4) reasonable time to prepare for the hearing; (5) opportunity to be represented by counsel; (6) opportunity to cross-examine persons on matters not relating to the characterization of any organization or individual other than the applicant;[2] (7) written notice of the fi-

---

2. Section 4 of Executive Order 10,865 provides for the limited number of situations

wherein cross-examination must be restricted because of the demands of nation-

nal decision concerning the allegations contained in the statement of reasons. 3 C.F.R. at 514, section 3. An exception to these procedures is provided in the Order's section 9, but the exception applies only in the event that the Secretary of Defense or the head of another executive department personally finds, without delegating his authority, that the procedures "cannot be invoked consistently with the national security and such determination shall be conclusive."

Section 2 of Executive Order 10,865 requires that an affirmative finding be made in the determination that access to classified information shall be authorized:

"An authorization for access to classified information may be granted by the head of a department or his designee, including but not limited to those officials named in section 8 of this order, to an individual, hereinafter termed an 'applicant', for a specific classification category only upon a finding that it is clearly consistent with the national interest to do so."

This section, by reference to section 8, expressly authorizes the Secretary of Defense to delegate to the Deputy or Assistant Secretary of Defense the responsibility for insuring that access to classified information is authorized only upon an affirmative finding of clear consistency with the national interest. Section 1(a) delegates the authority to executive department heads, including the Secretary of Defense, "by regulations [to] prescribe such specific requirements, restrictions, and other safeguards to protect (1) releases of classified information to or within United States industry * * *."

Pursuant to Executive Order 10,865, the Department of Defense promulgated DD 5220.6 on December 7, 1966. This Directive delegates to the Assistant Secretary of Defense (Administration) the responsibility for the control of access by industrial personnel to classified information and provides for the designation by him of a Screening Board to consider initially all cases involving the denial or revocation of an industrial security clearance. Section VIII (A) (2) of the Directive authorizes the Screening Board to investigate, to direct written interrogatories, and to conduct interviews with any individual, designated an "applicant," whose security clearance is being considered. The section also authorizes the Board to recommend to the Assistant Secretary of Defense (Administration) that the applicant's clearance be suspended pending the completion of proceedings. Section VIII (A) (5) directs the Board to issue a written notice if it determines that a security clearance is "clearly consistent with the national interest," the standard specified by Executive Order 10,865, and in such event to rescind any outstanding suspension. If, however, the Board's investigative findings do not warrant determination favorable to an applicant, the Board is required to serve a Statement of Reasons clearly outlining the further procedures and the applicant's right to counsel. DD 5220.6 § VIII (A) (6). In line with the Executive Order, the Directive, in its sections VIII(A) (7) and (8), entitles the applicant to a formal hearing if he so requests and if he replies to the Statement of Reasons. The Directive insures that this hearing, with right of appeal to an Appeal Board, is fully surrounded by the procedural safeguards which the Executive Order established to protect the interests of the applicant and which include recognition of the applicant's right to confront and cross-examine adverse witnesses. DD 5220.6 §§ VIII (B)–(F).

The Screening Board's investigative duties are an integral part of the procedures of section VIII of DD 5220.6 and are necessary to enable the Board to prepare a Statement of Reasons, required by section 3 of the Executive Order and section VIII of the Directive, or, on the other hand, to determine that an

al security. DD 5220.6 § VIII(D) (5) contains similar restrictions. We have

not intended to express, and we do not express, any opinion as to their validity.

individual's security clearance is clearly consistent with the national interest, as required by section 2 of the Executive Order and section VIII of the Directive. The Directive's section V (B), the section challenged by Shoultz, contemplates that one who seeks, or seeks to retain, his security clearance shall provide relevant information concerning his eligibility to the Board as it undertakes to perform its authorized investigative duties. The section provides,

> "In the course of an investigation, interrogation, examination, or hearing, the applicant may be requested to answer relevant questions, or to authorize others to release relevant information about himself. The applicant is expected to give full, frank, and truthful answers to such questions, and to authorize others to furnish relevant information. The applicant may elect on constitutional or other grounds not to comply. However, such a wilful failure or refusal to furnish or to authorize the furnishing of relevant and material information may prevent the Department of Defense from reaching the affirmative finding required by [Executive Order 10,865] in which event any security clearance then in effect shall be suspended by the Assistant Secretary of Defense (Admin-

istration), or his designee, and the further processing of his case discontinued."

In our opinion, this regulation in aid of the Board's performance of its delegated investigative duties is within the scope of authority granted by the President and is reasonably necessary in order that the Board and the Assistant Secretary of Defense may perform their duties as imposed by Executive Order 10,-865.

Since we have determined, by reasoning contained in a subsequent portion of this opinion, that these procedures, as applied to Shoultz, present no serious and unresolved questions of constitutional law, we need not now decide whether these authorized regulations were "explicitly" and "specifically" authorized by either Congress or the President. This was the issue posed by the Supreme Court in *Greene, supra,* 360 U.S., at 507, 79 S.Ct. 1400, wherein the Court did not resolve the constitutional issues, even though the procedures there attacked were far more questionable and possibly unfair than those available to Shoultz and under consideration here.

### DUE PROCESS OF LAW [3]

 The gravamen of Shoultz's constitutional argument is that he

---

3. Shoultz has not raised, and we do not now consider, any argument concerning a possible "chilling effect" that the Industrial Personnel Security Program might have on his freedom of association or whether, as to Shoultz, there is an overriding national interest in compelling his disclosure of his associations. *Cf., e. g.,* Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967) ; NAACP v. Alabama, 357 U.S. 449, 78 S. Ct. 1163, 2 L.Ed.2d 1488 (1958). Shoultz rests his argument on the Fifth Amendment, not the First. The Government, in support of the Program, cites, *inter alia,* In re Anastaplo, 366 U.S. 82, 81 S.Ct. 978, 6 L.Ed.2d 135 (1961) ; Konigsberg v. State Bar, 366 U.S. 36, 81 S.Ct. 497, 6 L.Ed.2d 105 (1961); Nelson v. County of Los Angeles, 362 U.S. 1, 80 S.Ct. 527, 4 L.Ed.2d 494 (1960); Lerner v. Casey, 357 U.S. 468, 78 S.Ct. 1311, 2 L.Ed.2d 1423 (1958); Beilan v. Board of Educa-

tion, 357 U.S. 399, 78 S.Ct. 1317, 2 L. Ed.2d 1414 (1958); Garner v. Board of Public Works, 341 U.S. 716, 71 S.Ct. 909, 95 L.Ed. 1317 (1951); Blumenthal v. FCC, 115 U.S.App.D.C. 305, 318 F.2d 276 (1963); Borrow v. FCC, 109 U.S. App.D.C. 224, 285 F.2d 666 (1960); and Cronan v. FCC, 109 U.S.App.D.C. 208, 285 F.2d 288 (1960). Shoultz's answer to these cases is, in his Brief at 10, the following:

> "The government does not explain why * * * [the rejection of First Amendment claims in certain of those cases] *is relevant to appellee's assertion of a Fifth Amendment right in the instant case,* but the suspicion that the government may have such an analogy in mind is buttressed by its citation to * * * [the remaining cases of those listed above]. Each of those authorities, like *Konigsberg* and *Anastaplo,* dealt not with a claim of a violation of

should not be required to assist in the Screening Board's investigation of his continued eligibility for a security clearance. If he had elected to answer the questions directed to him, final revocation of his clearance could not have occurred until the conclusion of an adjudicatory administrative hearing which would have satisfied constitutional requirements and, presumably, would have even harmonized with Shoultz's notions of fairness. At the adjudicatory hearing, Shoultz would have enjoyed his rights of confrontation and cross-examination. As required, the charges would have clearly been set forth in a Statement of Reasons, and final decision affecting his security clearance could not have been reached without the guarantee of procedures not subject to challenge. Here, Shoultz himself throws up the bar to those proceedings.

We are thus concerned with the Screening Board's preliminary investigative procedure and with suspension of one's clearance as the sanction for his refusal to provide relevant information, rather than with an adjudicatory proceeding convened to decide the eligibility for a security clearance of one who has been willing to disclose relevant information concerning such eligibility. Thus the proceedings included in Greene v. McElroy, *supra*, stand in contrast to the procedure faced by, and open to, Shoultz. In *Greene*, the industrial employee was fully willing to relate, and did relate, his version of the issues raising doubt about the desirability of his continued access to classified information. 360 U.S. at 478–479, 487–488, 79 S.Ct. 1400. The only adjudicatory hearings available to the employee in *Greene*, however, failed to provide him with any opportunity whatsoever to confront and cross-examine those making charges against him. If the procedures of DD 5220.6 had been available to the *Greene* employee, as they were to Shoultz in our case, the *Greene* employee would have

received the procedural safeguards for which he contended without the need for judicial intervention.

Shoultz contends that the Screening Board interview infringed his due process rights. We read from his Brief, at 7–8, the following:

"If this Court will imagine a hearing in which some of the guarantees of due process of law are present it will imagine everything that V. B. is not. There is no requirement of written specification of charges; no opportunity, consequently, to reply to such charges in writing; no opportunity to confront one's accusers; no right of cross-examination; no notice as to the burden of proof; no review of the proceedings."

The Screening Board did issue notice as to the burden of proof. The Board warned Shoultz that it considered that the information which it sought was relevant and germane to its determinations and that a refusal to answer could prevent the Department of Defense from reaching the affirmative finding required by Executive Order 10,865 and could result in the suspension of his clearance. Shoultz also received a copy of the regulations setting forth the procedures and the standards for making security clearance determinations.

We proceed, then, to Shoultz's allegations concerning the Screening Board's failure to provide a written specification of charges in connection with the interview, an opportunity to reply to such charges in writing, the opportunity to confront one's accusers, the right of cross-examination, and the right to a review of the proceedings. These are the same rights that *are provided* in the subsequent adjudicatory hearing required by DD 5220.6 for the final determination of the security clearances of those who have been willing to furnish relevant information during the Screening Board investigation.

due process of law but the assertion of a constitutional privilege when refus-

ing to answer particular questions." (Emphasis added.)

In Hannah v. Larche, 363 U.S. 420, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960), the Supreme Court distinguished the procedural defects found in Greene v. McElroy, *supra*, and approved an investigatory proceeding before the Commission on Civil Rights.[4] There, certain voting registrars under investigation attacked the proceeding because of the lack of disclosure to them of the identity of persons submitting complaints, of the failure to provide for cross-examination, and of the failure to relate interrogatories to specific complaints. The Court observed that the Commission did not make determinations controlling one's legal rights and that its sole purpose was to make factual findings which could be subsequently used as the basis for legislative or executive action. 363 U.S. at 441, 80 S.Ct. 1502. We read, at 442–443, 80 S.Ct. at 1514–1515:

"'Due process' is an elusive concept. Its exact boundaries are undefinable, and its content varies according to specific factual contexts. Thus, when governmental agencies adjudicate or make binding determinations which directly affect the legal rights of individuals, it is imperative that those agencies use the procedures which have traditionally been associated with the judicial process. On the other hand, when governmental action does not partake of an adjudication, as for example, when a general fact-finding investigation is being conducted, it is not necessary that the full panoply of judicial procedures be used. Therefore, as a generalization, it can be said that due process embodies the differing rules of fair play, which through the years, have become associated with differing types of proceedings. Whether the Constitution requires that a particular right obtain in a specific proceeding depends upon a complexity of factors. The nature of the alleged right involved, the nature of the proceeding, and the possible burden on that proceeding, are all considerations which must be taken into account. An analysis of these factors demonstrates why it is that the particular rights claimed by the respondents need not be conferred upon those appearing before purely investigative agencies, of which the Commission on Civil Rights is one.

It is probably sufficient merely to indicate that the rights claimed by respondents are normally associated only with adjudicatory proceedings, and that since the Commission does not adjudicate it need not be bound by adjudicatory procedures. Yet, the respondents contend and the court below implied, that such procedures are required since the Commission's proceedings might irreparably harm those being investigated * * *. There is nothing in the record to indicate that such will be the case * * *. However, even if such collateral consequences were to flow from the Commission's investigations, they would not be the results of any affirmative determinations made by the Commission, and they would not affect the legitimacy of the Commission's investigative function."

Mr. Chief Justice Warren, writing for the Court, related at length, in the Opinion and in a thirty-two page Appendix, that investigatory proceedings to determine facts upon which subsequent adjudicatory proceedings might be based are traditional and that they are widespread throughout our legal system.[5]

---

4. The Court distinguished the *Greene* case in the following language:

"[O]ur decision last year in Greene v. McElroy lends little support to the respondents' position. The governmental action there reviewed was certainly of a judicial nature. The various Security Clearance Boards involved in *Greene* were not conducting an investigation * * * ."
363 U.S. at 452, 80 S.Ct. at 1520. *See generally* Jenkins v. McKeithen, 395 U.S. 411, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969).

5. Mr. Chief Justice Warren drew an analogy between investigative administrative

The Chief Justice reviewed the procedure before the Federal Trade Commission as revealing of the full panoply of administrative proceedings which may result in subsequent adjudicatory action by an agency:

"A typical agency is the Federal Trade Commission. Its rules draw a clear distinction between adjudicative proceedings and investigative proceedings. 16 CFR, 1958 Supp., § 1.34. Although the latter are frequently initiated by complaints from undisclosed informants, *id.*, §§ 1.11, 1.15, and although the Commission may use the information obtained during investigations to initiate adjudicatory proceedings, *id.*, § 1.42, nevertheless, persons summoned to appear before investigative proceedings are entitled only to a general notice of 'the purpose and scope of the investigation,' *id.*, § 1.33, and while they may have the advice of counsel, 'counsel may not, as a matter of right, otherwise participate in the investigation.' *Id.*, § 1.40. The reason for these rules is obvious. The Federal Trade Commission could not conduct an efficient investigation if persons being investigated were permitted to convert the investigation into a trial. We have found no authorities suggesting that the rules governing Federal Trade Commission investigations violate the Constitution, and this is understandable since any person investigated by the Federal Trade Commission will be accorded all the traditional judical safeguards at a subsequent adjudicative proceeding * * *."

363 U.S. at 446, 80 S.Ct. at 1517. In the Appendix, the Chief Justice added,

"Finally, it is important to observe that the FTC, unlike the Civil Rights Commission, has the authority to commence adjudicative proceedings based upon the material obtained by means of investigative proceedings."

363 U.S. at 459, 80 S.Ct. at 1524.

There is no indication of any factors pertaining to the nature of the investigating agency or the subject of inquiry concerning Shoultz suggesting that the investigative procedure herein should be less valid than that upheld in Hannah v. Larche, *supra.* We therefore hold that the Screening Board's investigatory procedure under DD 5220.6 to make a factual determination upon which the necessity of a subsequent and fair adjudicatory proceeding depends is not violative of due process rights. We now turn to the question of whether Shoultz's failure to answer the questions directed to him was a ground upon which the suspension of his security clearance could permissibly be predicated.

In Gardner v. Broderick, 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968), and in Uniformed Sanitation Men Ass'n v. Commissioner of Sanitation, 392 U.S. 280, 88 S.Ct. 1917, 20 L.Ed.2d 1089 (1968), the Supreme Court held that it was impermissible for a public employee to be discharged for his refusal to waive his right to immunity from subsequent prosecution in light of his fifth amendment right to avoid self-incrimination. The Court stated, however, that a public employee may be discharged from his job

proceedings and our traditional grand jury procedures:

"[I]t would be profitable at this point to discuss the oldest and, perhaps, the best known of all investigative bodies, the grand jury. It has never been considered necessary to· grant a witness summoned before the grand jury the right to refuse to testify merely because he did not have access to the identity and testimony of prior witnesses. Nor has it ever been considered essential that a person being investigated by the grand jury be per-

mitted to come before that body and cross-examine witnesses who may have accused him of wrongdoing. Undoubtedly, the procedural rights claimed by the respondents have not been extended to grand jury hearings because of the disruptive influence their injection would have on the proceedings, and also because the grand jury merely investigates and reports. It does not try."
Hannah v. Larche, *supra*, 363 U.S. at 448–449, 80 S.Ct. at 1518.

if, without being required to waive immunity, he refuses to answer questions specifically, directly, and narrowly relating to the performance of his official duties. An employee's invoking of his constitutional privilege against self-incrimination would not, in such a case, be a bar to his dismissal from public employment. 392 U.S. at 278 and 283–284, 88 S.Ct. 1082, 1089. There is no saving difference between these public employee cases and the situation wherein an industrial employee seeks to maintain, for the sake of keeping his job, his privilege of access to classified information involving matters relating to our national security.

The interest which Shoultz attempts to promote in this case is not his right to continued employment. He could have protected that right until the completion of a fair adjudicatory hearing by providing the relevant information which the Screening Board requested of him. Shoultz's interest is actually the more narrow one of his claimed right to withhold factual information concerning his continued eligibility for a security clearance from the investigating administrative board charged by the President with the protection of classified information. This interest cannot and does not outweigh the paramount concern of the Government and the public to prevent classified national defense information from falling into the hands of persons whose reliability and loyalty are not clearly established. Surely an individual seeking a security clearance for the first time could not demand that the Government act upon his request without his supplying the relevant information required of him. Once he is granted the privilege of access, he should have no greater constitutional protection and has acquired no greater protectible interest in withholding relevant information. The obligation to furnish this information is as great, and possibly greater, after the Government has initially authorized that an individual be given access to classified material. The danger exists that the fruits of access already authorized may be misused, and the question remains whether additional classified material should be revealed. The Government's vital duty to permit access to classified information only when "clearly consistent with the national interest" (Executive Order 10,865, section 2) is a continuing duty. It is imperative that the Government shall conduct a complete investigation when an individual files his initial application for access to classified information. The Government should not thereafter be required to conduct similarly thorough investigations of industrial personnel possessing security clearances without the aid of relevant information supplied by the person most likely and easily able to supply it. A balancing of the interests of all those concerned with the industrial security program, including those already holding security clearances, heavily preponderates in favor of the reasonableness of the requirement that an individual holding a security clearance must, upon request, submit relevant information to the Screening Board in order to avoid possible suspension of his clearance.

Since the failure upon ground of constitutional privilege to answer questions directly relevant to the performance of official duties may be proper cause for dismissal from public employment, *Gardner* and *Sanitation Men, supra*, and since the refusal to answer similarly relevant questions upon ground of constitutional privilege may be cause for suspension of a security clearance upon which employment depends, Shoultz, *a fortiori*, must accept the consequences of his refusal to answer relevant questions upon the grounds that they are "incompetent, irrelevant, and immaterial."

Shoultz cannot seriously contend that the questions, quoted *supra*, concerning his relations with Cuban Communist Party and Cuban Government representatives and organizations were irrelevant. He argues, however, that an individual must guess at his peril whether, under DD 5220.6 § V (B), the questions will be "deemed relevant" and, consequently,

that the administrative procedures are invalid for failure to provide a suitable procedure for determination of the relevancy of the questions. In Watkins v. United States, 354 U.S. 178, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1957), the Supreme Court decided that a witness may not be punished for contempt of Congress following his objection to a question on the ground of pertinency if the subject under inquiry is not undisputably clear and if the investigating committee has not explained the pertinency of the question. 354 U.S. at 214–215, 77 S.Ct. at 1193. The Court wrote,

> "[W]e remain unenlightened as to the subject to which the questions asked petitioner were pertinent. Certainly, if the point is that obscure after trial and appeal, it was not adequately revealed to petitioner when he had to decide at his peril whether or not to answer. Fundamental fairness demands that no witness be compelled to make such a determination with so little guidance. Unless the subject matter has been made to appear with undisputable clarity, it is the duty of the investigative body, upon objection of the witness on the grounds of pertinency, to state for the record the subject under inquiry at that time and the manner in which the propounded questions are pertinent thereto."

*Id.* In this case, Shoultz was not under a similar disability to decide whether to answer the Screening Board's questions. On their face, they were clearly relevant to a determination of his fitness for continued access to national defense information. The Board advised Shoultz by letter prior to the interview that it desired "to determine the extent of his participation in Cuban affairs" for the purpose of determining his eligibility for a security clearance. The copy of the pertinent regulation, DD 5220.6, furnished Shoultz's attorney, set forth in section VI the relevant criteria for determining eligibility for a security clearance. The questions asked Shoultz were directly concerned with the criteria of subsections VI (B), (D), (F), (I), (J), and (K) set forth in the margin.[6] Since the Screening Board's questions were, with "undisputable clarity," pertinent to

6. "VI. CRITERIA
The criteria for determining eligibility for a clearance shall relate, but not be limited to, the following:
\* \* \* \* \*
B. Establishing or continuing a sympathetic association with a saboteur, spy, traitor, seditionist, anarchist, or with an espionage agent or other representative of a foreign nation whose interests may be inimical to the interests of the United States, or with any person who advocates the use of force or violence to overthrow the Government of the United States or the alteration of the form of Government of the United States by unconstitutional means.
\* \* \* \* \*
D. Membership in, or affiliation or sympathetic association with, or participation in the activities of any foreign or domestic organization, association, movement, group, or combination of persons which is totalitarian, fascist, communist, or subversive, or which has adopted or shows, a policy of advocating or approving the commission of acts of force or violence to deny other persons their rights under the Constitution of the United States, or which seeks to alter the form of Government of the United States by unconstitutional means.
\* \* \* \* \*
F. Performing or attempting to perform his duties, or otherwise acting, so as to serve the interests of another government in preference to the interests of the United States.
\* \* \* \* \*
I. Sympathetic interest in totalitarian, fascist, communist, or similar subversive movements.
J. Sympathetic association with a member or members, or an organization referred to in D., above. Ordinarily, this will not include chance or occasional meetings nor contacts limited to normal business or official relations.
K. Currently maintaining a close continuing association with a person who has engaged in activities or associations of the type referred to in A. through J., above. A close continuing association may be deemed to exist where the individual lives at the same premises as, frequently visits, or frequently communicates with, such person."

a subject of proper inquiry, the requirements of the *Watkins* case, *supra*, were fully satisfied.[7]

Shoultz faced fair and reasonable proceedings within the Department of Defense, proceedings legally authorized by Executive Order 10,865. The rights of Shoultz were not infringed. The questions directed to him by the Screening Board were not, as his counsel asserted, "incompetent, irrelevant, and immaterial."

The injunction issued by the District Court is vacated. Upon remand the complaint will be dismissed.

Reversed.

7. We do not now face such a case, but if some future proceeding might contain irrelevant questions or questions of doubtful relevancy infringing upon the protectible interests of one under inquiry, and if that person failed to obtain relief through administrative appeals within the Department of Defense, nothing in this opinion would preclude him from seeking judicial review and relief.