[No. 41762.    En Banc.    March 2, 1972.]

SEATTLE POLICE OFFICERS' GUILD et al., *Respondents*, v. THE CITY OF SEATTLE et al., *Appellants*.

*A. L. Newbould* and *J. Roger Nowell*, for appellants.

*Clinton, Moats, Andersen & Fleck*, by *Richard J. Glein*, for respondents.

HAMILTON, C.J.—This is an appeal from the action of the superior court in granting an injunction, the effect of which would prohibit the Seattle Police Department from seeking to elicit, under threat of dismissal, answers from individual police officers, either through direct questioning or through polygraph examination, to questions relating to the performance of their official duties.

The respondent, Seattle Police Officers' Guild, a professional association for police officers, as plaintiff, brings this action on behalf of its membership. The appellants (defendants) are the City of Seattle and the Chief of Police, under whose auspices an internal investigation into the conduct of certain police officers was being conducted.

We summarize the agreed facts. During 1970 several Seattle police officers were implicated in a pay-off system. The matter was widely publicized. Public confidence in the integrity of the police department was shaken. The then Acting Chief of Police, Charles R. Gain, initiated a departmental administrative investigation. During the course of the inquiry, the Acting Chief of Police proposed to require those officers interrogated to answer questions put to them relating to their official conduct and in some instances to submit to a polygraph examination all under threat of dismissal if they refused to cooperate.[1] By way of affidavit, the Acting Chief of Police asserted that "questions to be asked of the officers will be specifically, directly and narrowly related to the past performance of their official duties" and "at no time during the said investigation or any investigation concerning misconduct will any officer be directed to waive immunity from self-incrimination and prior to directing any officer to answer questions or to submit to a polygraph test, he will be advised that information gained by reason of his answers cannot be used against him in a criminal proceeding."

Contending that the proposed course of inquiry would contravene the constitutional privilege and protection against self-incrimination found in the fifth amendment to the United States Constitution, respondent instituted this action seeking a writ of prohibition. Appellants answered respondent's complaint and a hearing was held resulting in the issuance of a temporary injunction, the essence of which was to restrain appellants from disciplining any

[1] Seattle Police Department General Order 70-20 pertains to and requires the cooperation of officers in internal departmental investigations.

officer who, when questioned, claimed his constitutional privileges or who refused to submit to a polygraph test.

On appeal the Court of Appeals certified the cause to this court. We accepted jurisdiction.

Basically, two questions are presented which relate to and must be considered in the context of a police department internal administrative investigation of or inquiry into alleged police misconduct. One, may a police officer interrogated in the course of such an inquiry be lawfully disciplined or discharged for claiming his Fifth Amendment privilege against self-incrimination and refusing upon such ground to answer questions pertaining to the performance of his official duties? Two, may a police officer during such an inquiry be validly disciplined for refusing to submit to a polygraph test?

Starting with the premise that *Malloy v. Hogan,* 378 U.S. 1, 12 L. Ed. 2d 653, 84 S. Ct. 1489 (1964), and subsequent cases impress the privileges of the Fifth Amendment upon state proceedings through the due process clause of the fourteenth amendment to the United States Constitution, we answer the questions presented in the affirmative.

Our answer to the first question requires an examination and interpretation of four relatively recent decisions of the United States Supreme Court.

The first, *Garrity v. New Jersey,* 385 U.S. 493, 17 L. Ed. 2d 562, 87 S. Ct. 616 (1967), concerned police officers allegedly involved in fixing traffic tickets. During the course of an official investigation and as a prelude to questioning, they were advised that anything they might say could be used against them in a criminal proceeding, that they had the privilege to refuse to answer if their answer would tend to incriminate them, and that if they refused to answer they would be subject to removal from office. They answered the questions. Some of their answers were admitted into evidence, over their objections, in subsequent criminal prosecutions flowing from the investigation. They were convicted. Conceiving the choice imposed upon them, *i.e.,* self-incrimination or job forfeiture, was tantamount to

coercion, thereby rendering their statements involuntary, the United States Supreme Court, in a five to four decision, reversed their convictions stating, at page 500:

> We now hold the protection of the individual under the Fourteenth Amendment against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office, and that it extends to all, whether they are policemen or other members of our body politic.

The *Garrity* decision confined its attention and holding to the single proposition that statements obtained in the course of a disciplinary investigation under threat of dismissal from office could not be used as evidence in subsequent criminal prosecutions. As pointed out by the author of the *Garrity* opinion, Mr. Justice Douglas, in footnote 3 on page 516 of *Spevack v. Klein*, 385 U.S. 511, 17 L. Ed. 2d 574, 87 S. Ct. 625 (1967), a decision which was delivered on the same day as *Garrity*, said:

> Whether a policeman, who invokes the privilege when his conduct as a police officer is questioned in disciplinary proceedings, may be discharged for refusing to testify is a question we did not reach.

The *Garrity* decision thus preserved the Fifth Amendment protections for police officers during questioning under threat of dismissal in the course of disciplinary proceedings by precluding use of answers so elicited in subsequent criminal proceedings, thereby, and to that extent, stripping the answers of their incriminating nature. Although the *Garrity* holding would appear to be an adequate safeguard of the Fifth Amendment privilege against self-incrimination accorded police officers being questioned concerning their official conduct, the respondent contends that the decision in *Spevack v. Klein, supra,* should also apply to police officers.

In *Spevack* an order disbarring an attorney was reversed. During disbarment proceedings the attorney involved refused, on the basis of the Fifth Amendment, to produce subpoenaed financial records and to testify before the in-

quiring tribunal. As a result of his refusal he was disbarred. Four members of the court, in an opinion authored by Mr. Justice Douglas, reasoned that the Fifth Amendment extended to lawyers as well as laymen and should not be watered down by imposing the dishonor of disbarment as a penalty for asserting it. Mr. Justice Fortas concurred in the result, but expressed the view that a distinction should be made between an attorney's right to remain silent sans penalty of disbarment and that of a public employee who is asked questions specifically related to the performance of his official duties. In this respect Justice Fortas stated (385 U.S. 511, at 519):

> I would distinguish between a lawyer's right to remain silent and that of a public employee who is asked questions specifically, directly, and narrowly relating to the performance of his official duties as distinguished from his beliefs or other matters that are not within the scope of the specific duties which he undertook faithfully to perform as part of his employment by the State. This Court has never held, for example, that a policeman may not be discharged for refusal in disciplinary proceedings to testify as to his conduct as a police officer. It is quite a different matter if the State seeks to use the testimony given under this lash in a subsequent criminal proceeding. *Garrity* v. *New Jersey*, ante, p. 493. [385 U.S. 493, 17 L. Ed. 2d 562, 87 S. Ct. 616 (1967)]
>
> But a lawyer is not an employee of the State. He does not have the responsibility of an employee to account to the State for his actions because he does not perform them as agent of the State. His responsibility to the State is to obey its laws and the rules of conduct that it has generally laid down as part of its licensing procedures. The special responsibilities that he assumes as licensee of the State and officer of the court do not carry with them a diminution, however limited, of his Fifth Amendment rights. Accordingly, I agree that Spevack could not be disbarred for asserting his privilege against self-incrimination.

This distinction, as urged by Justice Fortas, was formally approved with respect to police officers by a majority of the Supreme Court membership (six with three concurrences)

in a subsequent decision, *Gardner v. Broderick*, 392 U.S. 273, 20 L. Ed. 2d 1082, 88 S. Ct. 1913 (1968). In *Gardner* a police officer was dismissed pursuant to a provision of the New York city charter which required, in pertinent part, that the employment of a city employee would terminate if he should refuse before an appropriate tribunal to answer questions in relation to his official duties on the ground that his answers might tend to incriminate him, or if he should refuse to waive immunity from prosecution on account of any such matter in relation to which he might be properly called upon to testify. The officer was dismissed on the ground that, as a witness before a grand jury investigating alleged bribery and corruption of police officers, he refused to waive immunity from prosecution. This occurred prior to the decision in *Garrity v. New Jersey, supra*. In holding that the requirement of a waiver of immunity vitiated the dismissal, the Supreme Court, nevertheless, with approval announced the principles which we believe to be applicable in the instant case. It was stated thusly (392 U.S. 273, at 277):

> It is argued that although a lawyer [alluding to the *Spevack* decision] could not constitutionally be confronted with Hobson's choice between self-incrimination and forfeiting his means of livelihood, the same principle should not protect a policeman. Unlike the lawyer, he is directly, immediately, and entirely responsible to the city or State which is his employer. He owes his entire loyalty to it. He has no other "client" or principal. He is a trustee of the public interest, bearing the burden of great and total responsibility to his public employer. Unlike the lawyer who is directly responsible to his client, the policeman is either responsible to the State or to no one.
>
> We agree that these factors differentiate the situations. If appellant, a policeman, had refused to answer questions specifically, directly, and narrowly relating to the performance of his official duties, without being required to waive his immunity with respect to the use of his answers or the fruits thereof in a criminal prosecution of himself, *Garrity v. New Jersey, supra* [385 U.S. 493, 17 L. Ed. 2d 562, 87 S. Ct. 616 (1967)], the privilege against

self-incrimination would not have been a bar to his dismissal.

(Footnotes omitted.)

The principles announced in *Gardner* were also applied to employees of the New York City Department of Sanitation in a case decided on the same day, *Uniformed Sanitation Men Ass'n v. Commissioner of Sanitation*, 392 U.S. 280, 20 L. Ed. 2d 1089, 88 S. Ct. 1917 (1968). As in *Gardner*, the employees had been discharged because of their refusal to sign waivers of immunity from prosecution in the course of investigatory proceedings concerning alleged corruption in their department. Although reversing a judgment dismissing their claim for relief, the Supreme Court again, as in *Gardner*, pointed out, at page 284:

As we stated in *Gardner* v. *Broderick, supra* [392 U.S. 273, 20 L. Ed. 2d 1082, 88 S. Ct. 1913 (1968)], if New York had demanded that petitioners answer questions specifically, directly, and narrowly relating to the performance of their official duties on pain of dismissal from public employment without requiring relinquishment of the benefits of the constitutional privilege, and if they had refused to do so, this case would be entirely different. In such a case, the employee's right to immunity as a result of his compelled testimony would not be at stake. But here the precise and plain impact of the proceedings against petitioners as well as of § 1123 of the New York Charter was to present them with a choice between surrendering their constitutional rights or their jobs. Petitioners as public employees are entitled, like all other persons, to the benefit of the Constitution, including the privilege against self-incrimination. *Gardner* v. *Broderick, supra; Garrity* v. *New Jersey, supra* [385 U.S. 493, 17 L. Ed. 2d 562, 87 S. Ct. 616 (1967)]. Cf. *Murphy* v. *Waterfront Commission*, 378 U. S. 52, at 79 (1964) [12 L. Ed. 2d 678, 84 S. Ct. 1594]. At the same time, petitioners, being public employees, subject themselves to dismissal if they refuse to account for their performance of their public trust, after proper proceedings, which do not involve an attempt to coerce them to relinquish their constitutional rights.

Mr. Justice Harlan, who had vigorously dissented in

*Garrity* and *Spevack,* joined by Mr. Justice Stewart, concurred in the results of *Gardner* and *Uniformed Sanitation,* and speaking of the combination of the four decisions stated (392 U.S. 280, at 285):

I find in these opinions a procedural formula whereby, for example, public officials may now be discharged and lawyers disciplined for refusing to divulge to appropriate authority information pertinent to the faithful performance of their offices. I add only that this is a welcome breakthrough in what *Spevack* [*Spevack v. Klein,* 385 U.S. 511, 17 L. Ed. 2d 574, 87 S. Ct. 625 (1967)] and *Garrity* [*Garrity v. New Jersey,* 385 U.S. 493, 17 L. Ed. 2d 562, 87 S. Ct. 616 (1967)] might otherwise have been thought to portend.

We are satisfied that Mr. Justice Harlan correctly assessed the thrust and effect of these four decisions. Other courts too have adopted his interpretation. *Clifford v. Shoultz,* 413 F.2d 868 (9th Cir. 1969); *In re Addonizio,* 53 N.J. 107, 248 A.2d 531 (1968), *Silverio v. Municipal Court,* 355 Mass. 623, 247 N.E.2d 379, *cert. denied,* 396 U.S. 878, 24 L. Ed. 2d 135, 90 S. Ct. 151 (1969); and *Kammerer v. Board of Fire & Police Comm'rs,* 44 Ill. 2d 500, 256 N.E.2d 12 (1970).

In the *Silverio* case, *supra,* the Supreme Judicial Court of Massachusetts, after taking note of *Garrity, Spevack, Gardner,* and *Uniformed Sanitation* cases, commented concerning the discharge of a policeman for refusing to answer questions relating to his official conduct, at page 629:

Thus an employee knows that if he fails to divulge information pertinent to the issue of his use or abuse of his public trust he may lose his job. The fact of employment poses the continuing choice of whether to divulge such information. The Constitution of the United States, however, as we understand its construction, does not require that a public employer continue to employ in a position of public trust an employee who declines or renders himself unable to perform the duties of his position on the ground of the constitutional protection against self-incrimination. No threat or pressure of his superior coerces his choice. His choice is his own, even though it may be affected by his expectation that his

superiors will perform their own public duties in the light of their appraisal of his conduct.

We agree with Mr. Justice Harlan in his concurrence in the *Gardner* [*Gardner v. Broderick*, 392 U.S. 273, 20 L. Ed. 2d 1082, 88 S. Ct. 1913 (1968)] and *Uniformed Sanitation* cases (392 U. S. at 285) [*Uniformed Sanitation Men Ass'n v. Commissioner of Sanitation*, 392 U.S. 280, 20 L. Ed. 2d 1089, 88 S. Ct. 1917 (1968)] that there is "in these opinions a procedural formula whereby . . . public officials may now be discharged . . . for refusing to divulge to appropriate authority information pertinent to the faithful performance of their offices.

We are in accord with this view.

The only case which would appear to express a contrary view is *Luman v. Tanzler*, 411 F.2d 164 (5th Cir. 1969) upon which the trial court relied. The issue in *Luman*, however, was different than in the instant case. Luman, a policeman, had been suspended and was facing simultaneously an administrative disciplinary proceeding and a criminal prosecution. He was seeking to enjoin the disciplinary proceeding pending disposition of the criminal prosecution. The court denied the injunction; however, in passing noted that Luman, if he testified at the disciplinary proceeding, might well prejudice his defense in the criminal action. Under these circumstances, the court felt he should not be penalized for exercising his Fifth Amendment protections. Insofar, otherwise, as the decision might be conceived as being at odds with our view of the sweep of *Garrity, Spevack, Gardner*, and *Uniformed Sanitation* it would be representative of a minority approach and one to which we would not now be willing to subscribe.

A police department is a highly sensitive agency entrusted and charged with the duty of protecting the community it serves from the evils of crime and corruption. To efficiently and effectively accomplish its mission it requires the respect and regard of the public, and when it has reason to believe that some of its members may be engaging in disreputable practices, it has a valid interest in purging itself of such practices through internal departmental pro-

cedures and the right to require the full cooperation of its membership to this end.

In the instant case, the questions to be asked the officers involved in the departmental inquiry, by the affidavit of the Acting Chief of Police, were to be specifically, directly, and narrowly related to the past performance of their official duties. The officers were not to be required to waive any immunity they might have, either under *Garrity* or otherwise, as to the use of their testimony or the fruits thereof in any subsequent prosecution. They were to be advised that information supplied through their answers could not be used against them in later criminal proceedings, and that their refusal to cooperate in the investigation could result in their dismissal. Under these circumstances we are convinced that within the procedural formula of the *Garrity, Spevack, Gardner,* and *Uniformed Sanitation* cases, the Fifth Amendment privilege against self-incrimination would not be a bar to discharge of an officer or officers who refused to answer questions pertaining to the use or abuse of his official duties.

We conclude, therefore, that the trial court was in error when it undertook to enjoin appellants from dismissing or otherwise disciplining any member of the Seattle Police Department for refusing, on the grounds of the Fifth Amendment privilege against self-incrimination, to answer in the course of the departmental inquiry questions specifically, directly, and narrowly related to that member's performance of his official duties.

We turn now to the second question, that is, whether appellants may require, under penalty of dismissal for refusal, officers questioned during an internal departmental inquiry to submit to a polygraph test. This presents an issue of first impression in this state, and has not been passed upon by the United States Supreme Court. There is a division of authority among the several states which have considered the matter.

The courts of three states, California, Illinois, and Louisiana have upheld dismissals of police who refused during

the course of administrative investigations into alleged police misconduct to submit to a polygraph test. The courts of two states, Connecticut and Pennsylvania have reached a contrary result.

We think the rationale and the reasoning of the California, Illinois, and Louisiana decisions are the more persuasive, and fully answer the contentions of respondent to the effect that the polygraph test is too fallible and amounts to an invasion of privacy. Furthermore, the Connecticut and Pennsylvania cases are distinguishable from the instant situation.

*Roux v. New Orleans Police Dep't,* 223 So. 2d 905 (La. App.), *aff'd,* 254 La. 815, 227 So. 2d 148 (1969), *cert. denied,* 397 U.S. 1008, 25 L. Ed. 2d 421, 90 S. Ct. 1236 (1970), the most recent of the decisions, involved an internal departmental investigation of a police officer's involvement with a homicide victim. The officer refused to take a polygraph test and was dismissed. In sustaining the dismissal, the court referred to the cases from the other states, and then predicated its determination upon *Fichera v. State Personnel Bd.,* 217 Cal. App. 2d 613, 32 Cal. Rptr. 159 (1963), stating, at page 911:

> We are guided to a great extent in our holding in the present case by what the Court said in the Fichera case [*Fichera v. State Personnel Bd.,* 217 Cal. App. 2d 613, 32 Cal. Rptr. 159 (1963)], and we say also that there may be many circumstances wherein a superior's order that a subordinate officer submit to a polygraph test would be unreasonable. We quote as follows from that case:
>
> "The polygraph is an extension of the age-old process of assessing the veracity of a witness, by scrutinizing his facial expression, rubescence, tremors, evasion of meeting the eye, and the like. It works through externals and is quite distinct from drug induced revelation, hypnosis, or any other form of narco-analysis. In the limited field of cases such as this one, and those of the prior cases cited above, we find no deprivation of constitutional or legal rights.
>
> "It may be conceded that there is a considerable degree of fallibility with the polygraph (see Sholnick, Sci-

entific Theory and Scientific Evidence: An Analysis of Lie-Detection, 70 Yale L.J. 694). It is not considered to have enough reliability to justify the admission of expert testimony in the courts based on its results, and a person's willingness or unwillingness to take the test is without enough probative value to justify its admission. (People v. Carter, 48 Cal.2d 737, 752, 312 P.2d 665.) It was recognized in the Frazee case [*Frazee v. Civil Serv. Bd.*, 170 Cal. App. 2d 333, 338 P.2d 943 (1959)], however, that it does not follow that the tests are completely without value. (170 Cal.App.2d at p. 335, 338 P.2d at pp. 944-945). The test might have proved useful in limiting and channeling the investigation in this case, in which three officers besides appellants were directed to take the tests, and acceded. It might have been an instrument of exculpation and vindication, on the one hand, or of more intensive investigation of the subjects of the test, on the other. We cannot, of course, tell what would have been the ruling of the State Personnel Board, or what our own ruling might have been, had the tests been taken and had produced results considered damaging by appellants' superiors. We do hold, however, that appellants were not entitled to withhold this means of investigation and at the same time retain their positions as officers of the California State Police."

While appellant's refusal to obey the order is not evidence of guilt or of knowledge of the identity of the guilty party, he may not be permitted to refuse to take the polygraph test in view of his sworn duty to cooperate in the investigation of crime. Under all the circumstances in this matter, we find that the order was reasonable.

Reaching a similar result the Appellate Court of Illinois in *Coursey v. Board of Fire & Police Comm'rs*, 90 Ill. App. 2d 31, 234 N.E.2d 339 (1967), observed, at page 43:

Effective and efficient operation of a police department requires that allegations of police misconduct be thoroughly investigated. The polygraph machine can be a useful investigative tool when the test is skillfully prepared and is administered and interpreted by a qualified person; while it is not accurate to the degree that absolute judgments can be made as to the veracity of the person tested (People v. Triplett, 37 Ill2d 234, 226 NE2d 30 (1967)) the results are often reliable within recog-

nized limits. Thus, for example, the results of a polygraph examination may be of help in narrowing the field of persons suspected of an offense or may assist in a determination whether to commence disciplinary action when, as here, there is an accusation against a police officer which he insists is untrue. Be that as it may, the issue is not the accuracy of a polygraph examination, but Coursey's failure to take an examination.

As we have indicated, the cases relied upon by the trial court and urged upon us by respondent—*Molino v. Board of Pub. Safety,* 154 Conn. 368, 225 A.2d 805 (1966), and *Stape v. Civil Serv. Comm'n,* 404 Pa. 354, 172 A.2d 161 (1961)—are distinguishable. In *Molino* the officers involved, and who were requested to take the polygraph tests, were not accused of criminal or anti-social behavior. Their dereliction which gave rise to the administrative investigation culminating in their refusal to take the polygraph tests was a failure to properly log and report an incident occurring while they were on patrol. Under these circumstances, the court concluded that their refusal together with their failure to properly comply with the police manual did not warrant discharge, noting that the penalty simply did not fit the case. In *Stape* the court held that a refusal to submit to a polygraph test did not amount to "just cause" for dismissal within the contemplation of the existing civil service regulations. Neither case completely closes the door upon the proposition that in appropriate circumstances a refusal to take a polygraph test could amount to grounds for dismissal.

In the instant case, serious and notorious charges of crime and corruption had, with appreciable cause, been leveled against members of the police department. By the very nature of the charges, serious public doubt was cast upon the integrity, the morality, and the fidelity of the department and its membership. An intensive internal administrative investigation was fully justified. Questioning in the course of the investigation was to be carried on within prescribed constitutional limits.

Under these circumstances, we conclude and hold

that if, in the exercise of prudent judgment, the investigating authority determines it reasonably necessary to utilize the polygraph examination as an investigatory tool to test the dependability of prior answers of suspected officers to questions specifically, narrowly, and directly related to the performance of their official duties, then, such investigating authority may properly request such officers to submit to a polygraph test under pain of dismissal for refusal.

Bearing in mind that the reasonableness of an investigating authority's request, under varying circumstances, can be subjected to judicial scrutiny and abuses of discretion thereby curbed, coupled with the fact that, in any event, the results of a polygraph test and a subject's willingness or unwillingness to take the test cannot be admitted into evidence in subsequent criminal proceedings, we see no constitutional or legal barrier to the conclusion we have reached.

With the foregoing disposition of the two questions presented we do not reach the remaining contentions of the parties.

Insofar as the temporary injunction issued by the trial court be inconsistent herewith, it is dissolved. Appellants shall recover their costs.

FINLEY, HALE, NEILL, and STAFFORD, JJ., concur.

ROSELLINI, J. (dissenting)—I disagree with the conclusion of the majority that rights guaranteed to all other persons under the constitutions of the United States and of this state are not available to police officers. The basis upon which this distinction is made is not clear to me from a reading of the opinion and I have great trouble in conceiving a rational basis for such a distinction. Is it that a police administrator is less apt to abuse his power, to use oppressive techniques to exact confessions from his own subordinates than he is when dealing with others accused of crime? Is it that a coerced confession is more reliable when wrung from a police officer than when wrung from some other individual? Is it that where police offenses are con-

cerned, no other method of investigation will reveal the facts? In the case of the polygraph, is this "technique" more reliable, is the administering of it less of an indignity when the subject is a policeman? Is the invasion of the policeman's privacy less offensive to the court than the invasion of the privacy of an accused murderer?

If all or any of these questions can be answered in the affirmative, I see no documentation of that answer in the opinion or in the record before the court.

In the opinion of the United States Supreme Court in the case of *Garrity v. New Jersey*, 385 U.S. 493, 17 L. Ed. 2d 562, 87 S. Ct. 616 (1967), cited and quoted by the majority, it was recognized that the threat of loss of employment is economic coercion, and that a confession obtained by that means is not a voluntary confession. I realize that dictum of the Supreme Court in a subsequent case, *Gardner v. Broderick*, 392 U.S. 273, 20 L. Ed. 2d 1082, 88 S. Ct. 1913 (1968), also cited and quoted in the majority opinion, indicates that the court would hold that the refusal to answer questions directed to the performance of an officer's official duties, based upon the Fifth Amendment privilege, would not be a bar to his dismissal.

It is true that the Fifth Amendment expressly forbids compulsory self-incrimination only in criminal proceedings. But the United States Supreme Court has applied it to the case of the lawyer faced with the "Hobson's choice between self-incrimination and forfeiting his means of livelihood." (*Spevack v. Klein*, 385 U.S. 511, 17 L. Ed. 2d 574, 87 S. Ct. 625 (1967).) It seems to me that if the constitutional prohibition is so strong and so pervasive that it relieves the lawyer of that choice, it also should relieve the policeman of that choice; and this court should not anticipate that the United States Supreme Court, when confronted with a case in which the point was actually at issue, would follow its dictum.

The only logical conclusion to be drawn from a rule of law which says that public officers and employees must testify under economic coercion, whereas others need not,

is that the privilege exists—not, as I had always thought, because coerced statements are not sufficiently reliable to justify the means used in obtaining them and because of the danger which they hold for the innocent, but rather it exists solely as a shield for the guilty. In other words, the court when it makes such a rule tacitly admits that it does not believe in the validity of the great privilege which our forefathers, still close enough to the abuse of power to remember its cruelties and injustices, so carefully embodied in the Bill of Rights.

It seems to me that it is of far greater importance that the police officer be genuinely committed to the principles embodied in the constitution than that he be required to give evidence against himself when suspected of misfeasance or malfeasance. If he is not committed to those principles, he is not likely to be conscientious in respecting the rights of persons accused of crimes when they are in his custody. And if this court holds that those principles and those rights apply to persons accused of crimes, to lawyers in the performance of their professional duties, to the employees of all but the state and its subdivisions (*see* RCW 49.44.120), what real meaning can they have for him? It should not be surprising if he views with contempt a constitution whose protection is extended to all but people like him.

It should be remembered that this action is not brought by policemen who have refused to answer questions. Rather, it is a class action, brought on behalf of all officers, the innocent as well as those who may be guilty. That such a group should bring this action is to me some rather sound evidence that persons whose duties include the taking of confessions and the administering of "lie-detecting" tests recognize the fallibilities of these techniques of crime solution. The innocent do not desire to be subjected to them anymore than do the guilty. What group can be in a better position to recognize the dangers of abuse, or of mistake?

If the extracting of a statement by the simple means of questioning an officer, under threat of dismissal if he does

not answer, is objectionable, it seems to me that the use of the polygraph is even more obnoxious. The majority recognizes that the technique is not reliable[2] and that the results of such a test are inadmissible in a court of law, still they authorize its use.

Here is how the test is administered:

> The polygraph proceeds on the underlying theoretical assumption that in telling a lie a person undergoes emotional stress, the physical manifestations of which are measurable. The polygraph seeks to chart such physical changes—by monitoring blood pressure, pulse, the pattern of breathing, and the perspiration rate—thereby, according to the theory, permitting the separation and exposure of truth from lie.
>
> In the operation of the polygraph, the subject is given a series of questions to answer while those familiar clinical instruments for measuring heart beat, blood speed, respiration, and perspiration are attached to the subject's body. An initial group of questions on noncontroversial matters is first posed to elicit truthful answers, thereby establishing the subject's "normal" patterns for heart, pulse, blood speed, respiration, and perspiration. After such norms have been so fixed, further questions, critical to the matter in issue, are asked. If, in answering such critical questions, the subject's heart beat, blood flow

---

[2]For examples of the reliability of the performance of this device, *see* J. Coghlan, Sr., *The Lie Box Lies,* 7 Trial Lawyer's Guide 173 (1963). Here is one, at page 184:

> The McCall case is within the memory of many members of the bar. A young woman was raped in a Chicago hotel. Immediately adjoining the hotel was a parking lot. The day following the occurrence all the lot personnel, including one of the attendants named Nixon, were required to take the test. The machine proclaimed their innocence. Some time later the hotel elevator operator, McCall, was arrested. Apparently convinced by the investigating officers that McCall was guilty of the rape, the polygraph operator gave him the full treatment and found him guilty of the rape. Since it was established by this scientific device that McCall was guilty, a confession was obtained from him. Fortified with this evidence, a jury returned a verdict of guilty. Some months later, the carhop, Nixon, became involved in another crime, and in a recitation of his accomplishments not only confessed to the rape for which McCall was found guilty but was able to fortify the assertions with many other facts, leaving no doubt that McCall had been wrongfully convicted.

speed, and respiration or perspiration rates deviate from the thus-established norms, then, say the polygraph promoters, the deviations are measurable responses to feelings of guilt, fears, or anxieties induced by lying. Such physical manifestations, say these theorists, reflect lying. On the other side of the coin, the nondeviation from the norms in answering these critical questions demonstrates truth-telling, according to the polygraph adherents.

(Footnote omitted.) M. Markson, *A Reexamination of the Role of Lie Detectors in Labor Relations,* 22 Lab. L.J. 394 (1971).[3] As the author of this article points out, critics of the polygraph have made these points:

(1) Many emotional factors, other than guilt, fear, anxiety, or even the conscious attempt to lie—such as pathologic conditions, neuroses, psychoses, and fears or anxieties of other sorts—may cause the observed measures of physiological changes. (2) The inference that lying causes guilt feelings, fears, or anxieties and such emotional changes in turn, cause a measurable physiological change, is incapable of empirical demonstration, and has not been so demonstrated. (3) The administration of the lie detector tests, requiring at the very least a psychologist—for the lie detector actually furnishes no more than "clues" or "hints"—is often in the hands of a mere technician. (4) No account is taken of the psychology of the tester and his potential for bias.

(Footnote omitted.) 22 Lab. L.J. at 396. *See* an exhaustive article on this subject by Oliver E. Laymon, professor of law at the University of South Dakota. This author concludes:

The uncontrolled use of lie detectors poses grave threats to the right to be exempt from unauthorized, arbitrary and unreasonable inquiries and disclosures. The technique is fraught with too many variables and sources of error to warrant its present wide usage. If its use is not carefully and continually scrutinized we may find that George Orwell's "1984" is upon us.

---

[3] *See also* D. Hermann, III, *Privacy, The Prospective Employee, and Employment Testing: The Need to Restrict Polygraph and Personality Testing,* 47 Wash. L. Rev. 73 (1971); J. Coghlan, *The Lie Box Lies,* 7 Trial Lawyer's Guide 173 (1963).

O. Laymon, *Lie Detectors—Detection by Deception,* 10 S. Dak. L. Rev. 1, 32 (1965).

It is generally recognized, I think, that any reliability this device may have depends upon the qualifications of the operator. This operator, who is accuser, witness, judge and jury, is the actual "lie detector"—not the machine which is attached to the body of the victim. The graph tells nothing. It is the operator's interpretation of it which determines whether a particular answer is true or false. The operator is, of course, a human being, and a human being does not have the disinterest, the detachment of a machine. He has motivations, prejudices, ambitions, interests to protect, including his own self-esteem. He also has foibles sometimes, such as laziness, indifference, or perhaps mere incompetence. While it is acknowledged that the best results are obtained only by highly trained operators, who have a thorough knowledge and understanding of human psychology, the fact is that most operators have received no more than a crash course at some school conducted by the industry.

It must be remembered that the manufacture and sale of the polygraph is an industry, and the claims that are made for it are made by persons who have an interest in that industry's success.

The court in this case accepts the appellants' statement that inquiries will be "specially, directly and narrowly related to the past performance of [the officers'] official duties." But the technique of the operator is to ask *irrelevant* questions, to find something that the subject will lie about, to establish his "control question." Irrelevant questions are also used to throw the subject off his guard. It would be interesting to see how the appellants' operator conducts his polygraph examination while adhering to the restriction which the appellants have imposed upon him by their affidavit signed by the police chief.

The court seems not at all disturbed that the police officer will have no opportunity to confront or cross-examine this witness against him, or to take from this judge's

rulings, or this jury's verdict any appeal to a higher tribunal. The operator's verdict is final.

I also am dismayed that the court sees no reason to require some showing that the tests will be administered by a qualified operator, or that the officers questioned will have an opportunity to challenge his qualifications or his findings. In my view of the matter, the court should never place its stamp of approval upon such a procedure. And even assuming that it can be shown that the operator is highly qualified, the objections to the use of the machine still outweigh the arguments in its favor.

As I read the majority opinion, anything goes, as long as it goes under the guise of "lie detector," however unreliable the court may have acknowledged the polygraph to be.

The legislature has seen fit to forbid the use of these devices upon employees, except certain public employees like the respondents. I do not construe RCW 49.44.120 to *authorize* tests for such employees; the legislature simply has not seen fit to forbid them. But obviously the legislature has taken cognizance of the evils attendant upon the use of such devices in industry and has declared that it is the public policy that they should not be used.

The reasons behind that determination are just as applicable to public employees as to private employees, in my opinion. It is interesting to note that the Atomic Energy Commission in 1953 decided to discontinue the use of lie detectors at Oak Ridge, the report stating in part:

> In weighing the advantages which might accrue to the AEC security program by the use of the polygraph technique on a Commission-wide basis it was concluded that such a program could be expected to result in only an indeterminate marginal increase in security beyond that which is currently afforded by established AEC procedures for personnel, physical, and document security. . . . consideration was given not only to the very substantial dollar costs of a polygraph program but also the intangible costs in employee morale, personnel recruitment, etc. It was concluded that such costs outweigh the benefits which might accrue to the AEC security program at this time.

(Footnote omitted.) 10 S. Dak. L. Rev. at 22.

In my opinion, the requirement that any employee submit to such a test or forfeit his employment invades his right of privacy and violates his right not to give evidence against himself. The test being so notoriously unreliable, and the "testee" having no opportunity or means of challenging the result, requiring an officer to submit to such a test is not a reasonable requirement. His refusal to submit should not be held by this court to constitute "just cause" for his dismissal.

I would affirm.

HUNTER and WRIGHT, JJ., concur with ROSELLINI, J.

Petition for rehearing denied June 2, 1972.