398 So.2d 463 (1981)
STATE of Florida DEPARTMENT OF HIGHWAY SAFETY AND MOTOR VEHICLES, Appellant,
v.
Alan ZIMMER, Appellee.
No. 79-1708.
District Court of Appeal of Florida, Fourth District.
April 22, 1981.
Rehearing Granted as to Certification of Question May 21, 1981.
Enoch J. Whitney, Gen. Counsel, and Michael J. Alderman, Asst. Gen. Counsel, Tallahassee, for appellant.
Howard L. Greitzer, Lyons & Sanders, Fort Lauderdale, for appellee.
DOWNEY, Judge.
This is an appeal from an order of the Career Service Commission of the State of Florida reversing an order of the Florida Department of Highway Safety and Motor Vehicles that dismissed appellee, Alan Zimmer, from the Florida Highway Patrol. Upon consideration of the briefs and record furnished this court, we conclude that the order of the Career Service Commission should be reversed.
Zimmer was an officer in the Florida Highway Patrol, having achieved permanent status with that agency. The issue involved in this case arose out of a personnel investigation ordered by the Director of the Division of Florida Highway Patrol, Colonel J.E. Beach, when it was discovered that money and property belonging to an accident victim was missing from the evidence locker in the Fort Lauderdale Highway Patrol station. During the course of the investigation all employees of the station were interviewed, including Zimmer. The interviews disclosed some discrepancies in Zimmer's story regarding his having won some money at the race track. Thus, two persons were asked to submit to a polygraph examination; one person submitted. However, Zimmer refused to submit unless he was officially charged with a crime, although he had been ordered by the Chief Investigator and by Colonel Beach to submit to the examination. Zimmer was thereupon notified by Colonel Beach that he was dismissed from the agency for failure to obey an order of a superior officer, willful violation of rules and regulations, and refusal *464 to voluntarily cooperate in an official investigation. Zimmer appealed his dismissal to the Career Service Commission, which, in due course, reversed the agency action and ordered Zimmer reinstated. The Commission relied heavily upon a 1975 Opinion of the Attorney General of Florida (AGO 075-94), which advised, essentially, that, because there is no express statute or rule authorizing the agency to dismiss a career service employee for refusal to undergo a polygraph examination, the agency lacks such authority.
In this court Zimmer argues in his brief that:
In the absence of statute or valid implementing rule specifically authorizing dismissal of a Career Service employee, such employee may not be discharged for failing to answer questions or allegations or refusing to submit to a polygraph examination. (Emphasis supplied.)
That argument, of course, finds support in the Attorney General's Opinion cited above. However, we find the argument unacceptable.
Upon becoming a Florida Highway Patrol Officer Zimmer took an oath to render strict obedience to his superiors in the Patrol and to observe and abide by all the orders and regulations prescribed by his superiors for the government and administration of the Patrol. Chapter 321, Florida Statutes (1977), creates the Florida Highway Patrol as a branch of the Department of Highway Safety and Motor Vehicles and authorizes that department to promulgate rules and regulations by which its personnel shall be examined, employed, trained, and discharged. Florida Administrative Code Rule 15-1.03 provides that the Chief Investigator is responsible for supervising activities of the employees and assigned investigations. Responsibility for personnel investigation is also assigned to regional commanders.
With regard to the rights of a Career Service Employee Section 110.061(1), Florida Statutes (1977), provides that "Any employee who has permanent status in the Career Service may only be dismissed for cause by the agency or officer by whom he is employed." Section 110.061(2)(a) requires the Department of Administration to establish rules and procedures for the suspension, reduction in pay, transfer, layoff, demotion, and dismissal of employees in the Career Service. Pursuant to this scheme, Florida Administrative Code Rule 22A-7.10(7)(b) permits an agency head to dismiss a Career Service employee for "just cause," which term includes, but is not limited to, negligence, inefficiency, or inability to perform assigned duties, repeated substandard performance of assigned duties, insubordination, willful violation of the provisions of law or agency rules, conduct unbecoming a public employee, misconduct, habitual drunkenness, or conviction of any crime involving moral turpitude.
If Zimmer's position is correct, he was not even required to answer any questions relating to the investigation because he is a Career Service employee and there is no statute or rule which expressly requires him to do so. That is Zimmer's position in his brief and the Attorney General's in Attorney General Opinion 075-94. In the case at bar, Zimmer did answer questions during his two interviews, but he refused to submit to the polygraph examination.
In our judgment Zimmer's contention should be rejected by this court. We find incredible the suggestion that a patrol officer is not required to answer questions directed to him during a personnel investigation in the face of the oath taken by patrol officers and the authority contained in Chapter 321. Implicit in the statute providing for the creation of the patrol agency and the promulgation of rules and regulations by which personnel are to be investigated and discharged is a delegation of authority to appoint agency officers to interview and interrogate the agency's personnel in the course of agency investigations. It follows that requiring such personnel to undergo a polygraph examination during the course of agency investigations is also authorized.
*465 This issue is one of first impression in Florida but not in the nation.[1] Other courts have held that a police officer may be required to submit to a polygraph examination under appropriate conditions. Those cases generally hold that there is no constitutional problem involved in requiring a public employee to submit to a polygraph examination so long as the employee is not coerced into waiving his constitutional right against self incrimination. In this case the appellee was advised the results of the examination were to be used only for the purpose of the interdepartmental investigation. Furthermore, (absent a stipulation to the contrary) polygraph results are not admissible in evidence in Florida. Kaminski v. State, 63 So.2d 339 (Fla. 1953).
In the most recent decisions from the Supreme Court of the United States concerning this issue, Uniformed Sanitation Men Association, Inc. v. Commissioner of Sanitation of the City of New York, 392 U.S. 280, 88 S.Ct. 1917, 20 L.Ed.2d 1089 (1968), and Gardner v. Broderick, 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968), the Court recognized the right of an appointing authority to discharge public employees for refusal to account for their performances of their public trust after proper proceedings which do not involve an attempt to coerce a relinquishment of constitutional rights.
In Grabinger v. Conlisk, 320 F. Supp. 1213 (N.D.Ill. 1970), the court ruled:
It is not the law that a public employer, in the course of a disciplinary hearing into an employee's conduct, may not require an employee to disclose information reasonably related to his fitness for continued employment. The net of Garrity [385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562], Broderick [392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082] and Uniformed Sanitation Men [392 U.S. 280, 88 S.Ct. 1917, 20 L.Ed.2d 1089] is that if a public employee refuses to testify as to a matter concerning which his employer is entitled to inquire, he may be discharged for insubordination, but if he does testify his answers may not be used against him in a subsequent criminal proceeding. The plaintiffs, therefore, were not compelled to waive their constitutional right against self-incrimination as a condition to their continued public employment. 320 F. Supp. at 1217-1218.
The court concluded that:
... the mere requirement of submission by a police officer to a polygraph examination during the course of a preliminary investigation concerning complaints about the officer's official conduct does not violate his guarantee to procedural due process. 320 F. Supp. at 1221.
In Gardner v. Broderick, 392 U.S. 273, 277-278, 88 S.Ct. 1913, 1916, 20 L.Ed.2d 1082 (1968), the Court stated:
It is argued that although a lawyer [alluding to Spevack v. Klein, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574] could not constitutionally be confronted with Hobson's choice between self-incrimination and forfeiting his means of livelihood, the same principle should not protect a policeman. Unlike a lawyer, he is directly, immediately, and entirely responsible to the city or State which is his employer. He owes his entire loyalty to it. He has no other `client' or principal. He is a trustee of the public interest, bearing the burden of great and total responsibility to his public employer. Unlike the lawyer who is directly responsible to his client, the policeman is either responsible to the State or to no one.
We agree that these factors differentiate the situations. If appellant, a policeman, had refused to answer questions specifically, directly, and narrowly relating to *466 the performance of his official duties, without being required to waive his immunity with respect to the use of his answers or the fruits thereof in a criminal prosecution of himself, Garrity v. State of New Jersey, ... [385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562], the privilege against self-incrimination would not have been a bar to his dismissal. (Footnotes omitted.)
We see a decided distinction between the foregoing cases that involve public employees and cases such as Swope v. Florida Indus. Comm., Unemp. Comp. Bd. of Rev., 159 So.2d 653 (Fla. 3rd DCA 1964), that involve the discharge of private employees for refusal to take a polygraph examination without the necessity to submit to such examination being known conditions of their employment. The personal integrity of the employees of a private employer has little, if any, direct impact on the members of the public; however, the personal integrity of public employees has enormous impact on the public and is of serious concern to the public; it is that public concern that impels us to reverse.
Accordingly, under the circumstances of this case the order to submit to the polygraph examination was reasonable and Zimmer was guilty of insubordination when he refused to comply with it. This refusal justified his dismissal for just cause. Thus, we reverse the order of the Career Service Commission and remand the cause with directions that the Commission reinstate the final agency order of dismissal.
REVERSED AND REMANDED, with directions.
HERSEY, J., concurs.
ANSTEAD, J., dissents, with opinion.
ANSTEAD, Judge, dissenting:
The majority has held that there is no difference between requiring an employee to undergo reasonable questioning during an internal investigation and submitting to a lie detector test. I cannot agree.
It is undisputed that Zimmer cooperated fully in answering all questions submitted to him in the course of several interviews. It was only because he balked at taking a lie detector test that he was discharged. Accordingly, the only issue before us is whether a police officer may be discharged from employment for refusing to submit to a lie detector test.
As noted in the majority opinion, there are numerous jurisdictions which have upheld a public employer's right to discharge policemen for refusing to submit to lie detector tests. Most of these decisions rely on the unique status of law enforcement officers as justifying a requirement that lie detector tests be taken so as to secure the public trust reposed in them. These decisions tend to discount as irrelevant any consideration of the unreliability of such tests.
However, other courts have refused to uphold the right of a public employer to discharge employees who refuse to take such tests.[1] These decisions rest, in large part, on the recognition that lie detector tests have not been demonstrated to be reliable.
The Florida Supreme Court has emphatically refused to recognize the reliability of lie detector test results[2] and there is no evidence of the test's reliability in the record before this court.[3] Assuming then that *467 such tests are unreliable, I believe that an order requiring a public employee to submit to the test is an unreasonable order. In concluding so, I find it difficult to ignore not only the unreliability of the test but also the potential use of the test results.
The majority does not discuss what use may be made of the results of the lie detector tests although apparently conceding that such results cannot be used in court. In this regard, I find persuasive the views expressed by Justice Uhlenhopp in a concurring opinion set forth in In re Discharge of Fairbanks, 287 N.W.2d 579 (Iowa 1980):
Since the results of polygraph tests cannot be used in court over objection, presumably civil service employers will not use the results as grounds for discharging employees and thus force employees to appeal to the courts. Hence we have the unanswered question, what use will be made of test results? If the polygraph operator says the employee failed the test, will the "failure" be noted on the employee's record and constitute an obstacle to advancement or to employment elsewhere? In any event, will word circulate through the department that the employee "failed the test"? Will the failure constitute a longtime black mark against the employee  notwithstanding the undemonstrated reliability of polygraph testing?
I would thus base the reversal on the same ground on which we refuse to admit polygraph-test results into evidence over objection: undemonstrated reliability. This obviates consideration of Fourth and Fifth Amendment implications. See Schmerber v. California, 384 U.S. 757, 764, 86 S.Ct. 1826, 1832, 16 L.Ed.2d 908, 916 (1966) ("Some tests seemingly directed to obtain `physical evidence,' for example, lie detector tests measuring changes in bodily function during interrogation, may actually be directed to eliciting responses which are essentially testimonial. To compel a person to submit to testing in which an effort will be made to determine his guilt or innocence on the basis of physiological responses, whether willed or not, is to evoke the spirit and history of the Fifth Amendment."); Hermann, Privacy, The Prospective Employee, and Employment Testing: The Need to Restrict Polygraph and Personality Testing, 47 Wash.L.Rev. 73, 135 (1971).
At 583.
The majority holds that the authority to compel questioning is implicit in the statutes authorizing supervision of the patrol officers and that the authority to compel lie detector tests naturally follows. Again I cannot agree. It is true that the United States Supreme Court has indicated that public employees may be subjected to questioning directly and narrowly limited to a pending investigation of their official duties.[4] However, there is a substantial quantitative and qualitative difference between such limited questioning and the administration of a lie detector test.[5] The scope of questioning during a lie detector test can be virtually unlimited. More importantly, however, the answers extracted are determined to be true or false based upon the involuntary physiological responses of the employee and the personal evaluation of the interviewer rather than upon the comparison of such answers with other credible evidence. As noted, supra, Florida and virtually every other jurisdiction have rejected the use of lie detector test results on the grounds of undemonstrated reliability. The majority's holding that these tests are nothing more than an extension of the employer's right to ask relevant questions does not square with these decisions. In essence the majority has implicitly determined, without any empirical evidence and notwithstanding the authorities to the contrary, that the test is a reliable investigatory tool and the results thereof may be properly utilized to resolve issues of employee conduct.
*468 The majority decision also creates the anomalous situation whereby the refusal of a public employee to take a lie detector test constitutes employee misconduct while that same refusal by a private employee does not constitute misconduct. In Swope v. Florida Industrial Commission Unemployment Compensation Board of Review, 159 So.2d 653 (Fla. 3d DCA 1963), it was held that the refusal of a private employee to take a lie detector test did not constitute misconduct connected with work so as to disqualify such employee from unemployment compensation:
Byron's could impose the rule and could discharge an employee who would not take the lie detector test. However, violation of an employer's rule which leads to discharge will not disqualify one for benefits unless it appears that the action which prompted the discharge amounted to misconduct within the meaning of the Act. Here the petitioner's discharge was not based on misconduct as defined. See Spaulding v. Florida Industrial Commission, Fla.App. 1963, 154 So.2d 334. In the only case brought to our attention dealing with whether an employee's refusal to take a lie detector test constitutes good cause for dismissal, it was held by the Pennsylvania Supreme Court that the refusal of a civil service employee to take a polygraph test was not just cause for his dismissal. See Stape v. Civil Service Comm. of City of Philadelphia, 404 Pa. 354, 172 A.2d 161.
In the instant case petitioners had not been singled out and accused of any acts of dishonesty. As to them the test was a fishing expedition. It has been disclosed that a tenth of the population are unfit subjects for polygraph tests, and that such tests tend to inaccuracies in from something less than ten up to twenty-five per centum of cases. See People v. Davis, 343 Mich. 348, 72 N.W.2d 269. Thus an innocent employee taking such a test could be risking loss of job and reputation at odds similar to those in Russian roulette. A different case would be made out for such refusal by one who entered the employment after the rule for lie detector tests was in effect and with knowledge that it was a condition of employment or continued employment; that is not the case, and we express no opinion thereon. Id. at 654
Unlike a private employee subject to discharge for virtually any reason, Zimmer, by virtue of his permanent status in the Career Service, could be discharged only for misconduct. The Swope court held that the refusal to take a lie detector test did not constitute employee misconduct. As in Swope it is also important to note that this case does not involve an employee's prior consent to taking such a test as a condition of employment.
Finally, I believe the decision this court renders today, by granting public employers carte blanche authority to force employees to submit to unlimited questioning during a lie detector test, will inevitably conflict with the employee's constitutional right of privacy now specifically recognized in Article I, Section 23 of the Florida Constitution,[6] as well as the employee's federal and state constitutional right not to be forced to bear witness against himself. I do not believe public employees should be granted any special rights and I certainly believe any violations of the public trust should be vigorously prosecuted. At the same time, however, I do not believe public employees should be treated as second-class citizens who are deemed to have waived their rights automatically upon becoming employed by the government.
NOTES
[1] See: Eshelman v. Blubaum, 114 Ariz. 376, 560 P.2d 1283 (1977); Fichera v. State Personnel Board, 217 Cal. App.2d 613, 32 Cal. Rptr. 159 (1963); Coursey v. Board of Fire and Police Commissioners, 90 Ill. App.2d 31, 234 N.E.2d 339 (1967); Roux v. New Orleans Police Department, 223 So.2d 905 (La. App. 1969); Dolan v. Kelly, 76 Misc.2d 151, 348 N.Y.S.2d 478 (1973); Talent v. City of Abilene, 499 S.W.2d 724 (Tex.Civ.App. 1973), rev. 508 S.W.2d 592 (Tex. 1974); Seattle Police Officers Guild v. City of Seattle, 80 Wash.2d 307, 494 P.2d 485 (1972); Grabinger v. Conlisk, 320 F. Supp. 1213 (N.D.Ill. 1970).
[1] See Molino v. Board of Public Safety of City of Torrington, 154 Conn. 368, 225 A.2d 805 (1966); In re Discharge of Fairbanks, 287 N.W.2d 579 (Iowa 1980); State v. Civil Service Commission of City of Philadelphia, 404 Pa. 354, 172 A.2d 161 (1961). In Pennsylvania there is now statutory authority for the administration of lie detector tests to law enforcement personnel as a condition of continued or initial employment. See McMullin Appeal, 41 Pa.Cmwlth. 474, 401 A.2d 572 (1979).
[2] See Kaminski v. State, 63 So.2d 339 (Fla. 1952); also see Codie v. State, 313 So.2d 754 (Fla. 1975), and Young v. State, 387 So.2d 512 (Fla. 1st DCA 1980).
[3] In fact, lie detector test examiners employed by the government are not even required to meet the minimum standards for licensing of examiners set by the state legislature. Section 493.562, Florida Statutes (1979). In any case, there is no evidence of the test's reliability or the examiner's qualifications in the record.
[4] Gardner v. Broderick, 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968).
[5] For example, see the description of the test set out in the dissenting opinion of Justice Rosellini in Seattle Police Officers Guild v. City of Seattle, 80 Wash.2d 307, 494 P.2d 485 (1972).
[6] For a discussion of some of the potential privacy problems involved see Fraternal Order of Police, etc. v. Freeman, 372 So.2d 945 (Fla. 3d DCA 1979) and Byron, Harless, Schaffer, Reid and Associates, Inc. v. State ex rel. Shellenberg, 360 So.2d 83 (Fla. 1st DCA 1978).