427 So.2d 187 (1983)
Arthur FARMER, Petitioner,
v.
CITY OF FORT LAUDERDALE, Respondent.
No. 61001.
Supreme Court of Florida.
February 10, 1983.
Bruce H. Little, Fort Lauderdale, for petitioner.
Donald R. Hall, City Atty., and Jon M. Henning, Asst. City Atty., Fort Lauderdale, for respondent.
ADKINS, Justice.
This is a petition to review the decision of the District Court of Appeal, Fourth District, Farmer v. City of Fort Lauderdale, 400 So.2d 99 (Fla. 4th DCA 1981), in which the following questions were certified by subsequent order as being of great importance:
1) Does Section 914.04 of the Florida Statutes and the Supreme Court's decision in Lurie v. Florida State Board of Dentistry, 288 So.2d 223 (Fla. 1973) prohibit the use of immunized testimony to discharge a city employee?
2) Should a city employee's right under the Fifth and Fourteenth Amendments to the Constitution of the United States and Article 1, Section 9 of the Constitution of the State of Florida require protection by immunization from all penal sanctions as opposed to only criminal?
3) Can a police officer be compelled to submit to a polygraph test when he is a suspect in a criminal investigation without granting him immunity from all penalties or forfeiture?
Farmer v. City of Fort Lauderdale, 400 So.2d 99 (Fla. 4th DCA 1981).
We have jurisdiction. Art. V, § 3(b)(4), Fla. Const.
At the time of the events giving rise to this action, petitioner was a police officer with the Fort Lauderdale Police Department. On April 28, 1977, he was working special duty at a bank, which duty included moving a portable bus vault from the teller's *188 window to the main vault. On this day, approximately $10,000 was reported missing from one of the bus vaults. All bank employees having access to the vault were given polygraph tests and were determined to be free from suspicion. Petitioner did not take a polygraph test at this time. Subsequently, the $10,000 was found, having been stashed in a false ceiling of the bank.
More than a year later, petitioner was ordered to take a polygraph test by his superior police officers. He declined to do so stating that he would not take the test at that time. Subsequently, petitioner was suspended and then dismissed by respondent for "willful violation of a lawful and reasonable regulation, order or direction, made or given by a superior officer where such violation has amounted to insubordination or serious breach of proper discipline or has resulted in loss or injury to the public." Dismissal was based on the recommendation of the Chief of Police and City Manager of Fort Lauderdale. Appeal was taken to the Civil Service Board of the City of Fort Lauderdale, which denied the appeal. This action was appealed to the circuit court, which dismissed the appeal, succinctly noting that "the Order requiring Appellant to submit to a polygraph examination was both lawful and reasonable. The refusal to obey the Order was sufficient reason to dismiss Appellant."
A further appeal was filed with the district court, which treated it as a writ of certiorari and denied it on the authority of its previous decision in State Department of Highway Safety and Motor Vehicles v. Zimmer, 398 So.2d 463 (Fla. 4th DCA 1981), Farmer v. City of Fort Lauderdale, 400 So.2d 99 (Fla. 4th DCA 1981) (Hurley, J. dissenting).
In Zimmer, the district court rejected the argument that in the absence of an express statute or rule authorizing an agency (therein the Florida Highway Patrol) to dismiss an employee for failure to take a polygraph test, the agency lacked such authority. It specifically held, concerning an issue that it regarded as a matter of first impression in this state, that implicit in the authority of the agency to investigate allegations of wrongdoing is the authority to require involuntary submission to a polygraph test. The court noted that the highway patrol officer under investigation was not coerced into waiving his constitutional right against self-incrimination and was advised that the results of the polygraph examination would be used only for the interdepartmental investigation, since they were not admissible in evidence in any judicial proceeding.
Judge Hurley's dissent in Farmer adopted the rationale set forth in Judge Anstead's dissent in Zimmer. Judge Anstead, observing that there was no evidence of the test's reliability before the court, stated that the order to take the test was unreasonable in light of the polygraph's history of having never been judicially recognized as reliable. In addition, Judge Anstead noted that the permissible scope of the questioning as set forth by the United States Supreme Court in Gardner v. Broderick, 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968), would necessarily be exceeded by the generally unlimited scope of questions used in a polygraph test. He also found objectionable the fact that the answers extracted would be determined to be true or false based upon physiological responses rather than comparison with other credible evidence. Finally, it was noted that granting to public employers a carte blanche authority to force employees to submit to unlimited questioning during a polygraph test would conflict with the employee's right to privacy under the Florida Constitution and abrogate his protection against self-incrimination under the United States and Florida Constitutions.
An examination of relevant federal law on the subject of dismissing public employees for refusal to answer questions is necessary to resolve this issue. In Garrity v. New Jersey, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967), the United States Supreme Court held that statements coerced from a police officer under threat of dismissal could not be used in any subsequent *189 criminal proceeding. In Gardner v. Broderick, the Court held that police officers refusing to waive their fifth amendment protection against self-incrimination could not be discharged for such refusal. However, the Court did hold that public employees could be dismissed if they refused to answer questions specifically, directly and narrowly relating to the performance of their official duties without giving up their fifth amendment rights against self-incrimination. Neither of these cases nor any subsequent United States Supreme Court cases dealt with the issue of required submission to polygraph tests. In the case sub judice, it should be noted that petitioner did not fail to answer questions directed to him concerning the matter under investigation.
Although a question of first impression in this state, it should be observed that other states have dealt with the question of dismissing police officers for failing to submit to polygraph tests and reached different conclusions. Courts in many states have held that a police officer can be dismissed for refusal to take a polygraph test. In Fichera v. State Personnel Board, 217 Cal. App.2d 613, 32 Cal. Rptr. 159 (1963), the court held that the need for confidence in public officers requires police officers under certain circumstances to risk self-incrimination in the course of maintaining their positions. Therein, the court noted that a lie detector test, while inadmissible in court, could be of value in channeling an investigation. In Richardson v. City of Pasadena, 500 S.W.2d 175 (Tex.Civ.App. 1973), reversed on other grounds, 513 S.W.2d 1 (Tex. 1974), the court, in upholding the right of a municipality to dismiss a police officer for failure to take a polygraph test, held that an officer could be subject to such a test if reasonable cause exists to believe he could supply information relevant to an investigation. In Coursey v. Board of Fire and Police Commissioners of Skokie, 90 Ill. App.2d 31, 234 N.E.2d 339 (1967), the court allowed the mandatory test, observing that if the officer passed the test, it would help establish public confidence since the public believes the test results are conclusive. Similarly, a Washington court in Seattle Police Officers Guild v. Seattle, 80 Wash.2d 307, 494 P.2d 485 (1972), held that the mandatory use of the polygraph is permissible if the subject of the inquiry is narrowly and directly related to the performance of official duties. Accord, Eshelman v. Blubaum, 114 Ariz. 376, 560 P.2d 1283 (Ct.App. 1977); Lemoine v. Department of Police, 348 So.2d 1281 (La. App. 1977); Dolan v. Kelly, 76 Misc.2d 151, 348 N.Y.S.2d 478 (Sup.Ct. 1973).
This view is, however, not unanimous. Other states, most notably Pennsylvania, New Jersey and Connecticut have taken the contrary position. See Stape v. Civil Service Commission of Philadelphia, 404 Pa. 354, 172 A.2d 161 (1961); Engel v. Township of Woodbridge, 124 N.J. Super. 307, 306 A.2d 485 (1973); Molino v. Board of Public Safety, 154 Conn. 368, 225 A.2d 805 (1966). In Stape, the court held that a police officer could not be dismissed for just cause since there was nothing contained in any relevant regulations requiring him to take the test. In Engel, the court based its decision on a state statute providing that no person could be required to take the test as a condition of initial or continued employment. In Molino, the court held that the lack of a regulation authorizing the test and the basic unreliability of the test combined to result in disallowance of its use.
The history of the use of polygraph tests in this state is not insubstantial. In Kaminski v. State, 63 So.2d 339 (Fla. 1952), this Court, in relation to the admissibility of the results of a polygraph test to bolster the credibility of a prosecution witness, held that the use of such a mechanical device could not substitute for the "time-tested, time-tried, and time-honored discretion of the judgment of a jury as to matters of credibility." 63 So.2d at 341. This precedent has not, however, served to keep all polygraph evidence out of court. In Codie v. State, 313 So.2d 754 (Fla. 1975), this Court held that such evidence could be admitted upon stipulation, either written or oral. On tangential issues, courts of this state have held that the mention at trial that a witness was asked to take a polygraph test raised an impermissible inference *190 of witness credibility, Crawford v. State, 321 So.2d 559 (Fla. 4th DCA 1975), that no presumption adverse to an individual failing to submit to a test can be drawn, City of Miami v. Jervis, 139 So.2d 513 (Fla. 3d DCA 1962); that a jury can give exculpatory polygraph test evidence admitted upon stipulation whatever weight it chooses and can convict on the basis of other incriminatory evidence, Coney v. State, 258 So.2d 497 (Fla. 3d DCA), cert. denied, 262 So.2d 448 (Fla. 1972); and that a defendant cannot demand discovery from the state of the polygraph results of a witness since such tests are not admissible in evidence, Anderson v. State, 241 So.2d 390 (Fla. 1970), vacated on other grounds, 408 U.S. 938, 92 S.Ct. 2868, 33 L.Ed.2d 758 (1972). The essence of these and other cases decided on the polygraph issue is that the polygraph is not a sufficiently reliable or valid instrument to warrant its use in judicial proceedings unless both sides agree to its use and that even upon its introduction it is not conclusive, but is only one other piece of evidence entitled to whatever weight it is assigned by the fact finder. For reasons hereinafter discussed, we hold that the same unreliability which prevents the polygraph's admissibility in court should preclude the dismissal of a police officer for failure to take a test.
The city agrees that polygraph testing is not foolproof and concedes that it could not use any evidence obtained from the test in any subsequent judicial proceeding concerning job dismissal. It argues, however, that information obtained from the test could be used as a basis for further investigation, such as identifying co-conspirators or locating the proceeds of the alleged crime. Any such evidence obtained in such an indirect manner would then be admissible in court. Aside from the questionable relevance of such a procedure in relation to the case sub judice (the money was found and apparently all others present at the scene of the alleged "crime" were vindicated by their polygraph tests), we must hold that the possible investigative benefit of building a case upon the foundation of the results of a polygraph examination is too thin a reed to support a denial of a police officer's right to be subjected only to lawful and reasonable orders.
Even though the record in this case does not contain any evidence empirically establishing the validity of the polygraph test, this Court can take judicial notice of certain basic principles under which the machine functions. A polygraph operates based on certain assumptions, to wit, that an individual will undergo physiological changes in blood pressure, breathing rate and galvanic skin responses when he knowingly makes an untrue statement. The theories behind the alleged validity of such an assumption are varied. One study states that there are four possibilities, namely, the conditioned response theory (questions elicit emotional responses related to subjects' past experience; the more traumatic the experience, the greater the autonomic response), the conflict theory (incompatible reaction tendencies, that is, to lie and to tell the truth, create physiological disturbances), the punishment theory (subject's fear of detection and punishment creates physiological response) and the arousal theory (ignoring any emotional basis and stating that the differential arousal values of various stimuli cause detection). Barland & Raskin, "Detection of Deception", Electrodermal Activity in Psychological Research 445 (W. Prokasy & D. Raskin eds. 1973).
Obviously, all of these, and whatever others may exist, are psychological theories not susceptible of readily available clearcut proof. The argument for the machine's reliability and validity is then based on tests which allegedly prove its correctness in a certain percentage of cases. Unfortunately, these studies yield results which vary greatly. Obviously, it is not within the ability or function of this Court to determine which, if any, of the number of such studies is most accurate. Suffice it to say that polygraph testing has not taken its place alongside fingerprint analysis as an established forensic science. It may someday meet that burden, but has as yet not done so.
*191 Various reasons are given by the polygraph's detractors for its alleged unreliability. According to them, numerous factors can influence the validity of polygraph testing. Among the most often mentioned are the skill of the operator, the emotional state of the person tested, the fallibility of the machine and, perhaps most importantly, the general failure to determine a specific quantitative relationship between physiological and emotional states. In addition, it has been generally accepted that physiological factors other than conscious deception can cause deviant autonomic responses. Frustration, surprise, pain, shame, and embarrassment, as well as other idiosyncratic responses incapable of being analyzed, can cause autonomic responses. Burkey, The Case Against the Polygraph, 51 A.B.A.J. 855 (1965).
Despite all these apparent shortcomings, the polygraph has attained an almost mythical aura. As a matter of fact, one of the general justifications for not allowing polygraph evidence in a judicial setting is the fact that it would not be received with the same equanimity as other evidence and could usurp the main function of the jury. The results of these tests are regarded as presumptively accurate and any protestations against their validity are generally viewed as being made in the obvious self-interest of those failing the test. Protestations on the machine's inaccuracy by those who passed the test when they should have failed would also seem to be rare for obvious reasons.
Next, we must analyze the setting in which the polygraph is to be used in this case. Petitioner was under investigation for an alleged crime. For approximately one year no substantial evidence of his involvement had been obtained. Apparently, as a last ditch effort, the city wished to exculpate or inculpate petitioner in relation to the crime by subjecting him to a polygraph test. They supplied him with letters from state and federal prosecutors purportedly extending him immunity from criminal prosecution. If petitioner had taken the test and "failed" it, the city would not have been able to use evidence of the polygraph test in any subsequent judicial proceeding in relation to any job dismissal. If petitioner had passed the test, presumably he would have had no further job-related repercussions from the incident.
As mentioned above, petitioner did answer questions about the incident as he would have been constitutionally required to do under Garrity. To further subject petitioner to the same questions when he is attached to a machine of undemonstrated scientific reliability and validity to obtain test results which could not be used in court, is, we believe not a lawful and reasonable order and can thus not provide a basis for dismissal. To hold otherwise would open the door for the use of other investigative techniques, such as hypnosis, sodium pentothal or whatever other technique any given municipality believes would be of any assistance in an investigation.
Police officers do not give up all their constitutional rights by putting on a uniform. In Headley v. Baron, 228 So.2d 281 (Fla. 1969), we stated, in a case involving compelled grand jury testimony, that while an individual does not have a constitutional right to be hired by the government, he does have, once employed and attaining seniority, an employment status entitling him to protection against unjust and unlawful job deprivation. See also Jones v. Board of Control, 131 So.2d 713 (Fla. 1961). We believe the action herein taken by respondent constitutes such unjust and unlawful job deprivation.
In response to the questions certified for our review, we make the following observations.
Given the resolution of this case on the merits, we find it unnecessary to answer the first question. The issues upon which this decision rests do not involve either section 914.04, Florida Statutes (1979), or our decision in Lurie v. Florida State Board of Dentistry, 288 So.2d 223 (Fla. 1973), concerning section 932.29, Florida Statutes (1967), the predecessor of section 914.04. Petitioner was not called upon to give testimony before any "court having felony trial jurisdiction, *192 grand jury, or state attorney", nor was he "duly served with a subpoena or subpoena duces tecum." In addition, the question of the effectiveness of the alleged immunity granted petitioner has not been a necessary consideration in light of the decision herein.
Similarly, we decline to answer the second question since the issue of immunization was never relevant.
Concerning the third question, it should be noted that our decision disallowing the use of a polygraph under the circumstances of this case makes the question irrelevant.
The petition is granted and the decision of the district court is quashed. The case is remanded to the district court for proceedings consistent with this opinion.
It is so ordered.
BOYD, EHRLICH and SHAW, JJ., concur.
OVERTON, J., concurs in result only.
ALDERMAN, C.J., dissents with an opinion, in which McDONALD, J., concurs.
ALDERMAN, Chief Justice, dissenting.
I would approve the decision of the Fourth District holding that a police officer can be discharged from the police department for refusing to submit to a polygraph examination when ordered to do so by his superior officer so long as he is not required to waive immunity from a prosecution based on the results of the examination. The rationale for this decision appears in the Fourth District's recent decision in State of Florida Department of Highway Safety and Motor Vehicles v. Zimmer, 398 So.2d 463 (Fla. 4th DCA 1981), to which it refers in the present case. In Zimmer, the district court noted that this was a question of first impression in this state, but not in the nation. It proceeded to analyze decisions of other jurisdictions supportive of its conclusion that Zimmer, an officer of the Florida Highway Patrol, could be dismissed for insubordination for his refusal to submit to a polygraph examination during the course of an agency investigation so long as he was not coerced into waiving his constitutional right against self-incrimination. The Fourth District in Zimmer accurately distinguished between private employees and public employees insofar as concerns their discharge for refusal to take a polygraph. It stated:
We see a decided distinction between the foregoing cases that involve public employees and cases such as Swope v. Florida Indus. Comm., Unemp. Comp. Bd. of Rev., 159 So.2d 653 (Fla. 3rd DCA 1964), that involve the discharge of private employees for refusal to take a polygraph examination without the necessity to submit to such examination being known conditions of their employment. The personal integrity of the employees of a private employer has little, if any, direct impact on the members of the public; however, the personal integrity of public employees has enormous impact on the public and is of serious concern to the public; it is that public concern that impels us to reverse.
398 So.2d at 466.
I agree with the district court's decision denying certiorari, and accordingly I would approve its decision.
McDONALD, J., concurs.