# DEPARTMENT OF EDUCATION v COTTRELL
## Case No. 87-4223
State of Florida, Division of Administrative Hearings

April 27, 1988

## APPEARANCES OF COUNSEL

**J. David Holder, Rigsby & Holder,** for petitioner.
**W. Dale Gabbard** for respondent.

## OPINION OF THE COURT

DIANE A. GRUBBS, Hearing Officer.

### *RECOMMENDED ORDER*

Pursuant to notice, a formal hearing was held in this cause on January 5, 1988, in Tampa, Florida, before Diane A. Grubbs, a Hearing Officer with the Division of Administrative Hearings.

### *ISSUE*

Whether respondent committed the acts alleged in paragraphs 3-7 of

the Administrative Complaint and, if so, whether such acts constitute violations of Subsections 231.28(1)(c) and (f), *Florida Statutes,* and Rule 6B-1.06(3)(a), *Florida Administrative Code.*

## BACKGROUND

On August 24, 1987, Betty Castor, as Commissioner of Education, filed an Administrative Complaint which alleged as follows:

1. The Respondent holds Florida Teaching Certificate 259659 covering the areas of Biology and Science.

2. At all times pertinent hereto, the Respondent was employed as a science teacher at Franklin Junior High School in the Hillsborough County School District.

3. On or about September 22, 2986, the Respondent was in possession of cocaine.

4. On or about September 23, 1986, the Respondent arranged the purchase of one gram of cocaine with an undercover police officer in a classroom at Franklin Junior High School during the school day.

5. On or about September 25, 1986, the Respondent was in possession of cocaine in his classroom at Franklin Junior High School during the school day.

6. On or about September 25, 1986, the Respondent used cocaine in his classroom at Franklin Junior High School during the school day.

7. On or about September 25, 1986, the Respondent discussed making a purchase of one gram of cocaine for $75.00 with an undercover police officer in his classroom during the school day.

Based on the above factual allegations, the complaint alleged that respondent was guilty of gross immorality or an act involving moral turpitude, in violation of Section 231.28(1)(c), *Florida Statutes,* that respondent was guilty of person conduct which seriously reduces his effectiveness as an employee of the School Board, in violation of Section 231.28(1)(f), *Florida Statutes,* and that respondent has failed to make reasonable effort to protect a student from conditions harmful to learning or to health or safety, in violation of Rule 6B-1.06(3)(a), *Florida Administrative Code.*

Respondent disputed the factual allegations set forth in paragraphs 3-7 of the Administrative Complaint, and requested a formal hearing. On September 28, 1987, the matter was referred to the Division of Administrative Hearings for further proceedings.

At the hearing, petitioner presented the testimony of Cindy Stanbro,

a police detective with the City of Tampa Vice Control Bureau; John Cuesta, a police sergeant in the Tampa Police Department, Vice Control Bureau; Gary Bradford, a school resource officer with the Tampa Police Department; and David Binnie, director of instructional personnel for the Hillsborough County School District. Petitioner's exhibits 1 and 3 were admitted into evidence, and the deposition testimony of Barbara Vohlken, a Florida Department of Law Enforcement Crime Laboratory Analyst, was admitted into evidence as a late filed exhibit. Respondent testified on his own behalf, and presented the testimony of 14 witnesses who had worked with respondent at Franklin Junior High School. Respondent's exhibits 1 and 2 were admitted into evidence. The depositions of Glynn Cheney and Dr. M. K. El-Yousef were admitted into evidence as late filed exhibits. Respondent was also authorized to submit the deposition of Dudley Dickson, a polygraph examiner, as a late filed exhibit; however, ruling on the admissibility of the testimony was reserved. For the reasons set forth in the conclusions of law, petitioner's object to the admission of the polygraph test results is sustained.

Both parties have filed proposed findings of fact and conclusions of law, and a ruling on each of the proposed findings of fact has been made in the Appendix to this Order.

## FINDINGS OF FACT

1. The respondent holds Florida Teaching Certificate No. 259659 covering the areas of biology and science. At all times pertinent hereto, the respondent was employed as a science teacher at Franklin Junior High School in the Hillsborough County School District.

2. In September, 1986, the Tampa Police Department received information from the principal of Franklin Junior High School and the resource officer that two teachers at the school might be involved in the use of cocaine or some other type of drug. Detective Cindy Stanbro was assigned to investigate the allegation. Detective Stanbro worked in an undercover capacity as a student intern teacher at Franklin Junior High School. Detective Stanbro was placed in the classroom of science teacher Keither Layton, who was aware of her true identity. Detective Stanbro initially reported to Franklin Junior High School on Friday, September 19, 1986.

3. On the Friday that she reported to Franklin Junior High School, she was able to meet the respondent and Michael Behl, the two individuals who were the subjects of the investigation. Before the end of the school day, Detective Stanbro invited the respondent to go out

156

for drinks with a group of teachers. The respondent was unable to go, but he told Detective Stanbro he would take a rain check.

4. On the following Monday, September 22, 1986, at about 1:20 p.m., Detective Stanbro went to respondent's classroom and asked him if he'd like to go to Casa Gallardo to have a drink after school. Respondent stated that he had come to work with somebody else, so he would need a ride home. Detective Stanbro told him that she could take him home, and respondent accepted her invitation.

5. Detective Stanbro and the respondent left the school at about 4:30 p.m. in Detective Stanbro's automobile. After stopping at a music store so that respondent could pick up some cassette tapes, respondent and Detective Stanbro went to Casa Gallardo, arriving at about 4:50 p.m. No one else joined them at the restaurant; however, backup surveillance units were at the restaurant observing Detective Stanbro and respondent.

6. After ordering drinks and engaging in general conversation about the school and why Detective Stanbro wanted to be a teacher, Detective Stanbro brought up the subject of drugs. She asked respondent if he liked to "get high." Respondent said that he did. He said he liked to smoke marijuana and snort cocaine. Respondent told Detective Stanbro that he had erected a partition in the back of his classroom which allowed him to look out and see his class but did not allow them to observe him. Respondent stated that he had put the partition up so that he could snort cocaine in the back of the room without the students seeing him. Respondent said that he used cocaine during fifth and sixth period because he would be mentally exhausted by the end of the day and he needed something as a "pick-up." He stated he used cocaine because he didn't have a coffee maker in his classroom.

7. During the conversation the respondent and Detective Stanbro also discussed prices paid for cocaine. Respondent told Detective Stanbro that he paid $50 for a half gram of cocaine. Detective Stanbro, who acted as if she used cocaine all the time, stated that the price was too high and told respondent that she knew a Colombian dealer from whom she could buy cocaine for $60 a gram. Respondent told Detective Stanbro that when his coke ran out, he would get Detective Stanbro to buy cocaine for him.

8. Detective Stanbro and respondent were not together at the restaurant the entire time, since respondent went to the restroom at some point during the evening. Sergeant Cuesta, who was part of the surveillance unit, happened to be in the restroom when respondent entered. Sergeant Cuesta left the restroom before respondent.

9. Detective Stanbro and the respondent left the restaurant at approximately 6:45 p.m. As they were getting ready to leave the restaurant parking lot, Detective Stanbro asked respondent if he had any cocaine on him. The respondent indicated that he did and produced a small smoke colored glass vial. Respondent wanted her to snort some then, but Detective Stanbro said she couldn't because she had to go to dance class and she didn't want to be high on cocaine while dancing. She asked him if he would give her some so that she could have it later. She gave him a dollar bill, and he put some of the substance from the vial on the dollar bill. Detective Stanbro folded the bill and kept it. There was approximately a half a gram of cocaine left in the vial. Respondent placed the glass vial back into his pocket.

10. Detective Stanbro took respondent home, then went back to the office and did a Vol-Tox test on the substance provided by respondent. The substance tested positive for the presence of cocaine. Detective Stanbro then placed the dollar bill containing the cocaine into the property room for safekeeping. The evidence was later chemically analyzed by use of ultraviolet spectrophotometry and gas chromatography mass spectrometry tests, which established conclusively that the substance contained cocaine.

11. Detective Stanbro saw respondent the following day at school, September 23, 1986, at approximately 10:20 in the morning. Detective Stanbro was in a little conference room in the back of Mr. Layton's biology class, and respondent came in to see her. Respondent handed Detective Stanbro $60 and stated that he needed to buy a gram of cocaine. Detective Stanbro told him that she would introduce him to the person who was selling the cocaine. However, Detective Stanbro kept the $60. Respondent then left the room.

12. The next contact Detective Stanbro had with respondent was on September 25, 1986, at about 1:45 p.m. Detective Stanbro went to see respondent in his classroom. Respondent was showing a film and the classroom was very dark. Detective Stanbro went to the back of the classroom to talk to respondent. Respondent was at his desk behind the partition. Detective Stanbro asked respondent if he had any cocaine on him, and respondent said that he had a little bit. Respondent stated that she could have a "snoot" if she wanted. Respondent took the glass vial out of his pocket. It was the same vial that he had at the restaurant; however, there was only a small amount of cocaine left in the vial. Detective Stanbro told respondent that she was afraid to snort any cocaine in the classroom because of the children being present, but respondent stated that it was easy and demonstrated by placing the vial, which had a flared screw-in top, up to his nostril and inhaling.

158

Detective Stanbro then took the vial and attempted to put some of the substance in the vial on a Kleenex so that it could be saved for evidence, but there was not enough cocaine in the vial for her to get a sample without scraping the sides, which she thought would look suspicious.

13. During the course of conversation with Detective Stanbro at the back of the classroom, respondent mentioned the $60 he had given her on Tuesday and asked about the gram of cocaine he was supposed to receive. He stated that it was a great deal and that he had never purchased cocaine so cheaply before. He added that the best price he had ever gotten before was $75 a gram. Detective Stanbro told him that they would get the gram of cocaine the next day around lunch time. She left respondent's class at about 2:40 p.m.

14. The next day, Friday, September 26, 1986, at about 10:20 a.m., respondent went to Mr. Layton's classroom to see Detective Stanbro. Respondent acted differently than he had before. He stated that he had just received a $300 electric bill and that he wouldn't be able to buy the cocaine. He wanted the $60 back. He stated that he was being too blatant about his use of cocaine at the school and told Detective Stanbro that he had decided to "cool it" for a while. He also asked Detective Stanbro very specific questions about her college background, including the classes and teachers that she had. Detective Stanbro felt that respondent was acting very suspiciously and concluded that respondent suspected her of being an undercover police officer.

15. After respondent left the classroom at about 10:45 a.m, Detective Stanbro called Sergeant Cuesta and advised him of the situation. Detective Stanbro went back to the vice office and a decision was made to prepare a warrant for respondent's arrest. At 2:45 p.m. Detective Stanbro returned to the school and placed respondent under arrest for possession and delivery of cocaine of less than a gram in weight. Respondent's arrest occurred during the school day while students were present an campus. The time and place of arrest was the decision of the Vice Control Bureau.

16. Shortly after his arrest, at about 4:15 p.m., Sergeant Cuesta interviewed the respondent after respondent was advised of his Miranda rights and signed a "Consent to be Interviewed" form. Respondent admitted telling Detective Stanbro that he got high on cocaine, but stated that he told her he did not enjoy smoking marijuana. He admitted having cocaine with him and providing some of the cocaine to Detective Stanbro. He admitted to Sergeant Cuesta that he used cocaine at school. He said that working with children was emotionally

**159**

draining and that he would get very tired at the end of the school day. He stated that because there wasn't a coffee maker in his classroom, he snorted cocaine. Respondent emphasized that he did not use cocaine in front of his students and stated that one of the reasons he put up a screen in front of his desk was to hide his cocaine use from the students. Respondent stated that he bought about a gram of cocaine at a time and it would last him about six months. Respondent became very emotional and stated that he was ashamed of himself for the embarrassment he had caused to his colleagues and to his family. He said he had a drug problem.

17. Respondent's testimony at the hearing was not credible and is rejected. Respondent testified that when he went to the restroom at the Casa Gallardo, there was a stranger in the restroom who offered the vial with the substance in it. The stranger said "Your girlfriend seems to be really into doing things. Why don't you give her some of this?" Respondent stated that the stranger wanted him to buy the substance, but when respondent said no, the stranger just gave him the vial with the substance in it. Respondent testified that he didn't know what was in the vial. However, he also testified that he gave the entire contents of the vial to Detective Stanbro the night they went to the restaurant when she asked for cocaine.

18. It is not only beyond belief that a stranger would approach the respondent in a public restroom and simply give him what turned out to be an expensive contraband drug, it is also beyond belief that the respondent would then give the entire contents of the vial to Detective Stanbro, fully believing that she would later consume the substance, when he had no idea what the substance was.

19. About four months after his arrest, respondent went to see Dr. M. K. El-Yousef, a psychiatrist, for the purpose of establishing that he was not a drug abuser. Respondent was given five tests by a substance abuse counselor and had a one hour interview with Dr. El-Yousef. The only information provided to Dr. El-Yousef was provided by the respondent. Based on the results of the five test and his interview with the respondent, Dr. El-Yousef opined that respondent "is not a substance abuser" and is a "relatively naive adult who means well as a teacher who got set up and fell *as he described.*" (e.s.) Obviously, Dr. El-Yousef believed that respondent was being truthful in describing the event leading up to his arrest. However, the events respondent related to Dr. El-Yousef simply did not occur. Respondent told Dr. El-Yousef that he met a girl at a bar who had approached him and asked him if he wanted to get high; that he "played it cool and said sure"; that he then bought some cocaine from an individual that the girl pointed out

160

to him; and that when the girl and he left to go to his apartment to use the cocaine, the police picked him up outside the bar. Since respondent was not entirely truthful with Dr. El-Yousef, the validity of Dr. El-Yousef's opinion concerning respondent's drug use or abuse is questionable. His opinion that respondent "got set up and fell as he described" is clearly erroneous.

20. From all the evidence presented, it is apparent that respondent's effectiveness as an employee of the school board has been seriously reduced. The respondent's arrest and subsequent trial and sentencing received a good deal of coverage in the local news media. However, it is not only the amount of coverage that respondent's activities received that has reduced his effectiveness as a teacher, it is respondent's own conduct that has seriously reduced his effectiveness as a teacher. By his conduct, respondent has established that he has extremely poor judgment and a total lack of awareness of the responsibilities of a teacher.

21. Student drug possession is considered a serious matter by the Hillsborough County Schools. If a student at Franklin Junior High is caught with drugs in his possession, he is turned over to the police for arrest. Approximately 70 percent of the school resource officer's teaching time is devoted to discouraging drug usage among students. Teachers set an example for their students; they serve as role models. By his conduct, respondent showed that he had little concern about the effect his drug use might have on his students.

22. In his proposed findings of fact, respondent suggests that Detective Stanbro "did entice" the respondent to a bar where the respondent "went along with the prompting of the undercover officer . . ." From the evidence presented, it is apparent that respondent has convinced himself that he was simply an innocent victim "set up" by an attractive woman who used the bait of romance to lure him into talking about drug use. However, respondent's rationalization of the events in question simply does not coincide with the facts, and his perception of this matter only emphasizes respondent's lack of awareness of the responsibilities of his profession. Respondent has completely overlooked the fact that throughout this episode he believed that Detective Stanbro was an intern, a college student placed in the school system to learn by experience and by example how to be a teacher. Had respondent possessed the slightest sense of responsibility to the educational process or his school system, he would not have condoned or encouraged an intern's use of drugs, regardless of the amount of "prompting" he received or his own desire for a romantic relationship. The respondent, however, not only indicated to this "intern" that the use of drugs by a teacher was acceptable, he explained how a teacher could use cocaine

**161**

in the classroom without getting caught by the students and then demonstrated how easy it was by snorting cocaine in front of the "intern" during one of his classes. This is clearly not the behavior of an educator who has any concern for his profession.

23. Respondent is currently on court-ordered probation for a period of 15 years. One of the conditions of his probation is that he submit to periodic drug testing. The drug abuse screens reported to the Department of Corrections on August 14, September 10, September 25, October 8, November 10, November 20, and December 8, 1987 did not reveal the presence of cocaine or any other drug. The evidence presented did not indicate that respondent was every a "heavy" drug user. Detective Stanbro testified that her impression was that respondent was a "casual" user. Further, respondent presented the testimony of a great number of his fellow teachers and other school staff, all of whom testified that respondent had never appeared to be disoriented or intoxicated.

## CONCLUSIONS OF LAW

The Division of Administrative Hearings has jurisdiction over the parties to and the subject matter of this proceeding. Section 120.57(1), *Florida Statutes.*

At the hearing in this cause, respondent was permitted to file the deposition of Dudley Dickson, a polygrapher who administered a polygraph test to respondent. Petitioner objected to the admission of any testimony relating to the polygraph results. Ruling on petitioner's objection was reserved.

In *Farmer v City of Fort Lauderdale,* 427 So.2d 187 (Fla. 1983), the Supreme Court summarized the case law regarding the admissibility of polygraph test results as follows:

> The essence of these and other cases decided on the polygraph issue is that the polygraph is not a sufficiently reliable or valid instrument to warrant its uses in judicial proceedings unless both sides agree to its use and that even upon its introduction it is not conclusive, but is only one other piece of evidence entitled to whatever weight it is assigned by the fact finder.

The Court went on to take judicial notice of the basic principles under which the polygraph machine functions, and then added:

> Obviously, all of these, and whatever others may exist, are psychological theories not susceptible of readily available clear-cut proof. The argument for the machine's reliability and validity is then based on tests which allegedly prove its correctness in a certain percentage

162

of cases. Unfortunately, these studies yield results which vary greatly. Obviously, it is not within the ability or function of this Court to determine which, if any, of the number of such studies is most accurate. Suffice it to say that polygraph testing has not taken its place along fingerprint analysis as an established forensic science. It may someday meet that burden, but has as yet not done so.

Respondent presented no evidence in this case from which it could be concluded that polygraph testing has now met that burden. Indeed, respondent failed to present any evidence of the reliability or validity of the polygraph.

Respondent urges that the polygraph test results should be admitted pursuant to Section 120.58(1)(a), *Florida Statutes,* which provides that in an administrative proceeding,

> [i]rrelevant, immaterial or unduly repetitious evidence shall be excluded, but all other evidence of a type commonly relied upon by reasonably prudent persons in the conduct of their affairs shall be admissible, whether or not such evidence would be admissible in a trial in the courts of Florida.

Respondent argues that "the science of polygraph examinations is widely used by reasonably prudent persons including law enforcement agencies and prosecutors," and therefore polygraph test results should be admissible in an administrative proceeding. However, respondent presented no evidence that polygraph examinations are widely used by reasonably prudent persons. Second, using a polygraph examination is not the same as relying on the results of a polygraph examination. Finally, the most logical interpretation of the cited portion of Section 120.58(1)(a), *Florida Statutes,* is that evidence which might be excluded in a court of law under the strictures of the Florida Evidence Code, may be admitted into evidence in an administrative proceeding if the evidence is relevant and reliable. The courts of Florida have held that polygraph test results are not admissible because the polygraph test is not reliable. It follows that the same unreliability which prevents the polygraph's admissibility in court, precludes its admissibility in an administrative proceeding. Petitioner's objection to the admission of evidence relating to the results of the polygraph examination performed by Mr. Dickson is, therefore, sustained.

The Education Practices Commission has the authority to suspend, revoke, revoke permanently, or otherwise discipline the teaching certificate of any person who "[h]as been guilty of gross immorality or an acting involving moral turpitude," section 231.28(1)(c), *Florida Statutes,* who "[u]pon investigation, has been found guilty of personal

**163**

conduct which seriously reduces that person's effectiveness as an employee of the school board," section 231.28(1)(f), *Florida Statutes,* or who "[h]as otherwise violated the provisions of law or rules of the State Board of Education, the penalty for which is revocation of the teaching certificate," section 231.28(1)(h), *Florida Statutes.*

The Administrative Complaint alleges that respondent violated subsections 231.28(1)(c) and (f), *Florida Statutes* (1985), and Rule 6B-1.06(3)(a), *Florida Administrative Code.* Rule 6B-1.006 (formerly Rule 6B-1.06), provides in pertinent part as follows:

(1) The following disciplinary rules shall constitute the Principles of Professional Conduct for the Education Profession in Florida and shall apply to any individual holding a valid Florida teacher's certificate.

(2) Violation of any of these principles shall subject the individual to revocation or suspension of the individual teacher's certificate, or the other penalties as provided by law.

(3) Obligation to the student requires that the individual:

(a) Shall make reasonable effort to protect the student from conditions harmful to learning or to health and safety.

The evidence presented in this case established that respondent has been guilty of gross immorality or an act involving moral turpitude. In *Adams v State Professional Practices Council,* 406 So.2d 1170 (Fla. 1st DCA 1981), the court held that two teachers who had marijuana plants growing in a greenhouse in their backyard were guilty of gross immorality or an act involving moral turpitude. The First District Court of Appeal distinguished the case of *Pearl v Florida Board of Real Estate,* 394 So.2d 189 (Fla. 3d DCA 1981), as follows:

The *Pearl* case involved the suspension of a realtor's license by the Florida Board of Real Estate because he pled guilty to the possession of marijuana. The court ruled that "possession of a controlled substance does not establish moral turpitude within the purview of Section 475.25(1)(e)." In our view, however, the moral standard to be upheld by teachers is different from that of realtors, since teachers are charged by §§ 231.09 and 231.28(1) with providing leadership and maintaining effectiveness as teachers. By virtue of their leadership capacity, teachers are traditionally held to a high moral standard in a community. See *Negrich v Dade County Board of Public Instruction,* 143 So.2d 498 (Fla. 3d DCA 1962).

In this case, the respondent was not only in possession of a controlled substance, respondent possessed and used the controlled substance while he was at school engaged in his teaching duties.

164

The evidence also establishes that respondent is guilty of personal conduct which seriously reduces his effectiveness as an employee of the school board. Teachers have a duty to set a good example for their students. Clearly, respondent's conduct has severely reduce, if not eliminated, his effectiveness in this regard. Further, respondent's effectiveness has been seriously reduced by his personal conduct because his actions indicate that he has extremely poor judgment, a disrespect for law, and a lack of concern for professional responsibilities.

Finally, respondent has violated the Principles of Professional Conduct for the Education Profession in Florida by failing to make a reasonable effort to protect his students from conditions harmful to learning or to health or safety. A teacher who uses cocaine in the classroom not only fails to make an effort to protect his students from conditions harmful to learning or to the students' health and safety, he exposes them to such conditions.

Based on the foregoing, respondent is subject to discipline pursuant to Subsections 231.28(1)(c), (f) and (h), *Florida Statutes.*

## RECOMMENDATION

Based on the foregoing findings of fact and conclusions of law, and pursuant to Section 231.262(5), *Florida Statutes,* it is

RECOMMENDED that a final order be entered revoking respondent's teaching certificate.

*Editor's Note:* The final order entered on June 18, 1988 has been appealed and as of September 20, 1988 was pending in the Second District Court of Appeal.

DONE AND ORDERED this 27th day of April, 1988, in Tallahassee, Leon County, Florida.