# SCHOOL BOARD OF BROWARD COUNTY v PAULINE
## Case No. 83-2210
State of Florida, Division of Administrative Hearings
January 31, 1985

## APPEARANCES OF COUNSEL

**William S. Cross** for petitioner.

**Ronald W. Houchins, Kaufman, Houchins & Ferdinand,** for respondent.

## OPINION

SHARYN L. SMITH, Hearing Officer.

## RECOMMENDED ORDER

This matter came on for hearing in Fort Lauderdale, Florida, before the Division of Administrative Hearings, by its duly designated Hearing Officer, Sharyl L. Smith on November 16, 1983. Testimony and evidence was again received on December 20, 1983, and again on February 13, 1984, at which time the Hearing concluded.

### ISSUES PRESENTED

Whether Respondent should be dismissed from her position as a Media Specialist or otherwise disciplined for alleged violation of Section 231.09, and 231.26(6), F.S., as set forth in the Petition dated June 13, 1983.

This proceeding arises from a Petition filed by William T. McFatter, Superintendent of Schools for the Broward County School System, on June 13, 1983, that seeks to dismiss Respondent, Antionette Pauline, a media specialist in the public schools of Broward County, Florida. In five (5) Counts, the Petition alleges as follows:

1. That on May 4, 1983, the Respondent grabbed Steven Richardson, a fifth grade student at Nob Hill Elementary School, by the arm and forcibly pushed said student against or into a classroom door approximately three (3) times, which action constitutes misconduct in office in accordance with applicable Florida Statutes, State Board of Education Administrative Rules, and School Board policies;

2. That on May 4, 1983, the Respondent took Steven Richardson's media center pass and pulled on the front of teacher Verda Farrow's blouse in the presence of said student and forcibly jammed the pass down the inside front of the teacher's blouse, which action constitutes misconduct in accordance with applicable Florida Statutes, State Board of Education Administrative Rules, and School Board policies;

3. That on February 16, 1983, the Respondent was directed to cease from verbally attacking teachers, and that she again verbally attacked Verda Farrow on May 4, 1983, which action constituted gross insubordination and/or willful neglect of duty in accordance with applicable Florida Statutes, State Board of Education Administrative Rules, and School Board policies;

4. That during the 1981-1982 school year, the Respondent had several other encounters with faculty and students at Sunrise Middle School and that during the school year 1982-1983, the Respondent had several encounters with the faculty at Nob Hill Elementary School, the result of which would make it difficult, if not impossible, for Respondent to recover and be an effective librarian, which actions constitute

misconduct in office and/or willful neglect of duty and/or incompetency, in accordance with applicable Florida Statutes, State Board of Education Administrative Rules, and School Board policies; and

5. That the Respondent has violated the Code of Ethics by failing to practice her teaching profession with the highest ethical standards by failing to protect the student, Steven Richardson, from unnecessary embarrassment or disparagement, by failing to protect the student from conditions harmful to learning and/or safety, and/or making false or malicious statements about her colleagues, which actions constitute misconduct in office in accordance with applicable Florida Statutes, State Board of Education Administrative Rules and School Board policies.

Respondent denied the allegations in the Petition and requested an Administrative Hearing. Thereafter, eighteen (18) witnesses were called by the Petitioner, five (5) witnesses were called by Respondent, and forty (40) exhibits were offered into evidence. The deposition testimony of Ernest M. Roberts was accepted as a late-filed exhibit. Further, ruling on the admissibility of the polygraph examination conducted upon Respondent was deferred. The testimony of the polygraph examiner, his chart, and rebuttal testimony were offered by proffer, subject to a continuing objection as to its admissibility, without stipulation, in an Administrative Hearing.

Proposed Recommended Orders containing findings of fact have been submitted by the parties and considered in the preparation of this Recommended Order. When the parties' findings of fact were consistent with the weight of the credible evidence introduced at the final hearing, they were adopted and are reflected in this Recommended Order. To the extent that the findings were not consistent with the weight of the credible evidence, they have been either rejected, or when possible, modified to conform to the evidence. Additionally, proposed findings which were subordinate, cumulative, immaterial or unnecessary have not been adopted.

### FINDINGS OF FACT

1. The Respondent was employed by the Broward County School Board commencing with the school year 1960-61. She was originally employed as a librarian in an elementary school, and, thereafter, held several positions, including Media Specialist (librarian) with the Broward County Migrant Program and the State Department of Education, Florida Migratory Section. She presently holds a Master's degree in library science which she received in July of 1975.

2. In 1977, the Respondent obtained a position at Dillard High

School and was promoted to the position of Head Media Specialist. At the conclusion of the school year 1980-81, the Respondent was administratively transferred by the Area Superintendent to Sunrise Middle School, where she remained as a media specialist for that school year, when she was again administratively transferred by the Area Superintendent to Nob Hill Elementary School for the school year 1982-83. Following the incident which occurred on May 4, 1983, Respondent was transferred to the staff of the Directory of Learning Resources of the Broward County School System for the remainder of school year 1982-83. Thereafter Respondent was suspended pending the results of this hearing.

3. During her tenure at Dillard High School, the Respondent incurred several problems with the staff and the principal wherein complaints were received from teachers who were not utilizing the media center, and from students who felt they were being treated unfairly. The Respondent had a problem interacting and communicating with white people and as a result, became ineffective. When Amos Bonner, the principal at Dillard High School, concluded that Respondent's effectiveness had been impaired, he brought the matter to the attention of the Area Superintendent, William Dandy. Consequently, the Respondent was administratively transferred to Sunrise Middle School.

4. During the school year 1981-82, while assigned to Sunrise Middle School, the Respondent incurred similar problems with the faculty and students at that school. Her principal, Nick Gancitano, found her to be defensive, negative, and communicated with the faculty, students and administration in a negative way. Students were not using the library, and there was a dramatic decrease in the number of books being circulated from the previous year. As the problem seemed to get progressively worse, throughout the year, her principal concluded that her overall effectiveness as a Media Specialist was impaired. Principal Gancitano, who was charged with the responsibility for evaluating the performance of the Respondent in accordance with her job description, concluded that the Respondent lacked the "ability to work with principals, teachers and other appropriate educational leaders in order to design learning experiences and to recommend educational media suited to specific instructional objectives, and to stimulate effective utilization of media" and, further, lacked the "ability to inspire and gain the respect of staff and students." Michael Galbreath and James Rupp, fellow teachers at Sunrise Middle School, related incidents where children were crying out of frustration and upset with the experiences that they encountered in the library. It reached the point

that Mr. Galbreath would not take his classes to the library. Instead, he would sneak into the library or would purchase books from his own financial resources, for classroom use, so the children would not have to enter the library. Mr. Galbreath testified that the Respondent's attitude was belligerent and intimidating, and that other classroom teachers had also refused to take their children to the library. He concluded that the Respondent's effectiveness as a Media Specialist was impaired and that, as a direct result of her severe problems in dealing with people, the Respondent was incompetent. Mr. Rupp testified that the Respondent was "standoffish" and that she didn't really want to relate to everyone that was at the school. He was also aware that children were not utilizing the library facility towards the end of the year and he concluded that her effectiveness as a Media Specialist was "null and void." During the school year 1981-1982, these complaints were brought to the attention of the Area Superintendent, William Dandy, who requested an investigation. He had received complaints from parents and from teachers concerning the Respondent. Because of her inability to discharge her required duties at Sunrise Middle School, at the conclusion of school year 1981-82, Respondent was again administratively transferred this time to Nob Hill Elementary School.

5. While at Nob Hill Elementary School during school year 1982-83, Respondent again involved herself in altercations with other faculty members. Susan Reynolds, a fellow teacher at Nob Hill Elementary School, testified that Respondent threatened to "choke her" and that as a result of the comment, she was intimidated and afraid of the Respondent. She called this to the attention of Ernest Roberts, the Principal at Nob Hill. The Respondent also had a confrontation with Verda Farrow, which resulted in Mr. Roberts directing the Respondent to cease from verbally attacking and accusing teachers of "talking about you" and "spying on you."

6. On May 4, 1983, Steven Richardson, then a fifth grade student of Verda Farrow's, went to the library with a pass to check a bibliography. The Respondent was reading to a kindergarten class and for no justifiable reason she determined that Steven Richardson's attempt to gain her attention was disruptive. She took Steven Richardson to the office and discovered that Mr. Roberts was out of the building. Thereafter, she took the student to Verda Farrow's classroom to discuss the matter with her. During the conversation that ensued outside the classroom door, the Respondent grabbed Steven Richardson by the arm and attempted to push him into the door approximately three times. Respondent also grabbed Mrs. Farrow by the dress, pulled her dress loose, and stuffed the library pass down the front of Mrs.

164

Farrow's dress. This incident was witnessed by Steven Richardson and several of the students in the classroom at the time, three of whom testified at the Hearing.

7. Following the incident on May 4, 1983, a Police Report was filed, and school security conducted an investigation of the alleged incident. Faculty members, upon becoming aware of the incident, boycotted the library and several parents, who became aware of the incident, wrote unsolicited letters requesting that their children not be sent to the library.

8. Arthur Rose, President of the Nob Hill Elementary School P.T.O. Advisory Committee, became aware of the situation and received phone calls at his office and his home from parents who were concerned regarding their children. Mr. Rose believes that he and the parents with whom he spoke had concluded that Resondent's effectiveness as a Media Specialist had been impaired. The parents were desirous of having the Respondent removed from the school and they feared for the safety of their children.

9. Following the investigation by school security, the Respondent was transferred on a temporary basis to the staff of the Director of Learning Resources by Benjamin F. Stephenson, Associate Superintendent for Personnel. This was not an existing position.

10. The Respondent denied ever touching Steven Richardson. The Respondent admits that the position of Media Specialist, or librarian, is in some respects more difficult than the position of a classroom teacher, in that a classroom teacher is only responsible for dealing or communicating with one class of students, while a Media Specialist must effectively communicate with three or four hundred children a day. The Respondent also agrees that a librarian must have good communication skills among faculty members.

11. To corroborate the Respondent's contention that she did not grab Steven Richardson and push him into the door, the Respondent submitted to a private polygraph examination conducted by Robert Rios, who concluded that the Respondent did not attempt deception when asked whether she grabbed Steven Richardson by the arm and pushed him into the door on May 5, 1983. He concluded that the reliability of this polygraph examination should have at least equal weight to eyewitness testimony.

12. In rebuttal to the proferred testimony of Mr. Rios, his polygraph examination chart and findings were reviewed by Carl Lord, investigator and polygraph examiner for the State Attorney's Office in Broward County, Florida, and the individual under whom Mr. Rios served an

internship. Mr. Lord had previously supervised Mr. Rios in conducting twenty or thirty polygraph examinations, and has reviewed his charts in one hundred fifty to three hundred cases. Mr. Lord concluded, based upon the pre-test and test procedures utilized, that the validity of the test conducted upon Respondent was less than fifty (50%) percent. Mr. Lord further testified that in the State of Florida, polygraph examinations are only admissible in Court upon stipulation of both parties. The purpose of the stipulation is to ensure that the subject is testable, that there is a testable issue, and that the pre-test and test procedures utilized result in conclusive and reliable findings.

## CONCLUSIONS OF LAW

1. The Division of Administrative Hearings has jurisdiction over the parties and subject matter of these proceedings.

2. Section 231.36(6), Florida Statutes, (1981), authorizes the Petitioner to suspend or dismiss a teacher who has attained continuing contract status only for "immorality, misconduct in office, incompetency, gross insubordination, willful neglect of duty, drunkeness, or conviction of any crime involving moral turpitude." The Petitioner charged the Respondent with misconduct in office, incompetency, gross insubordination and/or willful neglect of duty. Rule 6B-4.09, Florida Administrative Code, further defines these criteria as follows:

(a) Incompetency is defined as inability or lack of fitness to discharge the required duty as a result of insufficiency or incapacity.

(b) Inefficiency is defined as a repeated failure to perform duties prescribed by law (Section 231.09, Florida Statutes); repeated failure on the part of a teacher to communicate with and relate to children in the classroom, to such an extent that pupils are deprived of minimum educational experience.

(c) Incapacity is defined as lack of emotional stability.

(d) Misconduct in office is defined as a violation of the Code of Ethics of the Education Profession so serious as to impair the individual's effectiveness in the school system.

(e) Gross insubordination or willful neglect of duty is defined as a constant or continuing intentional refusal to obey a direct order, reasonable in nature, and given by and with proper authority.

3. The Code of Ethics of the Education Profession referred to in Rule 6B-4.09, Florida Administrative Code, is promulgated as Chapter 6B-1, Florida Administrative Code. In pertinent part, the Code requires that a teacher "accord just and equitable treatment to all

**166**

members of the profession in the exercise of their professional rights and responsibilities." Rule 6B-1.04(2)(b), Florida Administrative Code.

4. The Respondent failed to accord Steven Richardson "just and equitable treatment" when she grabbed Steven Richardson and attempted to push him into the door of the classroom on May 4, 1983. There was a violation of the Code of Ethics of the Education Profession, so serious as to impair the Respondent's effectiveness in the school system. This conclusion is made in view of the concern by parents and other teachers as a result of this incident.

5. The Respondent failed to accord Verda Farrow "just and equitable treatment" when she took Steven Richardson's media center pass and pulled on the front of Verda Farrow's blouse in the presence of Steven Richardson and forcibly jammed the pass down the inside front of Verda Farrow's blouse on May 4, 1983. This was a violation of the Code of Ethics of the Education Profession, so serious as to impair Respondent's effectiveness in the school system.

6. The Respondent is guilty of gross insubordination or willful neglect of duties when she continued to confront Verda Farrow on May 4, 1983, after being directed by her immediate supervisor on February 16, 1983, to cease from verbally attacking and accusing teachers. This was a violation of the Code of Ethics of the Education Profession, so serious as to impair Respondent's effectiveness in the school system.

7. The Respondent is guilty of misconduct in office in that her effectiveness as a Librarian/Media Specialist was impaired to the extent that it would be difficult, if not impossible, for her to recover and be an effective librarian as a result of her altercations with faculty and students at Sunrise Middle School during the 1981-82 school year and with the faculty of Nob Hill Elementary School during the 1982-83 school year. This was a violation of the Code of Ethics of the Education Profession so serious as to impair Respondent's effectiveness in the school system.

8. Respondent is guilty of misconduct in office and inefficiency when she failed to protect Steven Richardson from unnecessary embarrassment or disparagement and in her failing to protect Steven Richardson from a condition harmful to his learning and/or safety, which conduct deprived Steven Richardson and other students at both Sunrise Middle School and Nob Hill Elementary School from the minimum educational experience which resulted from the teachers of those schools, as well as the parents of the students in those schools, refusing to allow their students and children to utilize the media facilities. This is a

violation of the Code of Ethics of the Education Profession, so serious as to impair Respondent's effectiveness in the school system.

9. Rule 6B-5.10 requires that competent educators shall not show disrespect for or lack of acceptance of others and shall provide leadership and direction for others by appropriate example. Rule 6B-5.11 requires the competent educator to be able to communicate so effectively as to accomplish the designated task, and shall appropriately control her emotions.

10. School teachers are held to high standards of conduct because of the nature of their profession.

"A school teacher holds a position of great trust. The teacher is entrusted with the custody of children and their high preparation for useful life. His habits, his speech, his good name, his cleanliness, the wisdom and propriety of his unofficial utterances, his associations, all are involved. His ability to inspire children and to govern them, his power as a teacher, and the character for which he stands are matters of major concern in a teacher's selection and retention. *Moser v. State Board of Education*, 101 Cal. Reptr. 86 (Cal. App., 3rd 1978)."

10. Among teachers, a Media Specialist or librarian occupies a unique position. Such a person is entrusted with not only the care, custody and education of a single classroom of children, but with all the children with whom he or she may come in contact; the media center is the focal point of an educational facility. Consequently, effective inter-personal relationships and good communicative skills are paramount when determining the effectiveness or competency of a Media Specialist or librarian. The evidence conclusively shows that Respondent's lack of fitness to discharge her required duty as a result of insufficiency or incapacity was evident and her effectiveness has been impaired to the extent that she can no longer be effective in her position.

11. Regarding the admissibility of a polygraph examination in an administrative proceeding, absent stipulation by counsel, a polygraph examination is not admissible in a court of this State without a stipulation. *Codie v. State*, 313 So.2d 754 (Fla. 1975). Most recently, courts of this State have held that the mention at trial that a witness was asked to take a polygraph test raised an impermissible inference of witness credibility. *Farmer v. City of Fort Lauderdale*, 427 So.2d 187 (Fla. 1983). This principle was further emphasized in *Whitten v. Whitten*, 407 So.2d 367, (Fla. 2d DCA 1981), whereby the admission of polygraph evidence favoring the defendant was ruled inadmissible unless stipulated by both parties.

12. The latitude which administrative hearing officers have with respect to the admission of evidence, mainly hearsay, but also all evidence which would be excluded under Rules of Evidence, common to jury trials and courts has been commented upon thoroughly in *Davis, Administrative Law*, 271-290, (3rd Ed. 1972); and *Schwartz, Administrative Law*, 333-341 (1976); however, Florida courts have ruled that Administrative Hearings must adhere to a standard of basic fairness in order to satisfy the requirements of due process of law. *City of Miami v. Jarvis*, 130 So.2d 513 (Fla. 3d DCA, 1962); and *Jones v. City of Hialeah*, 294 So.2d 686 (Fla. 3d DCA 1974). Further, "No Hearing Officer nor court may in the absence of consent, either express or implied, consider evidence received over objection, which is outside the issue and then rely on that evidence as the basis for his or its ultimate order." *Gandy v. Department of Offender Rehabilitation*, 351 So.2d 1133 (Fla. 1st DCA 1977).

13. The courts consistently define the limits of evidence to be admitted at Administrative Hearings by the terms "competent, substantial evidence." Substantial evidence has been described as such evidence as will establish a substantial basis of fact from which the fact at issue can be reasonably inferred, and such relevant evidence as a reasonable mind would accept as adequate to support a conclusion. The evidence relied upon to sustain the ultimate finding should be sufficiently relevant and material that a reasonable mind would accept it as adequate to support the conclusion reached. To this extent the "substantial" evidence should also be "competent." *Degroot v. Sheffield*, 95 So.2d 912 (Fla. 1957). In view of the fact that stipulations are required in courts of this State in order to protect and preserve the integrity of the pre-test, test and the validity of the polygraph examination, this type of evidence should be no less "competent" or "substantial" than that which is required by the courts of this State. To do otherwise would be to depart from essential requirements of law. There was other substantial and competent evidence admitted at the hearing concerning the incident which occurred on May 4, 1983, and since the Respondent's polygraph examiner testified that the weight to be given to his polygraph examination was not greater than that of eye witness testimony, the result would not be different in the event that the polygraph examination evidence were excluded. This is true especially when taking into consideration the validity of this particular examination. As a result, evidence of a polygraph examination should not be admissible in an Administrative Hearing absent a stipulation by the parties, wherein the pre-test and test procedures can be agreed upon in advance.

## RECOMMENDATIONS

It is recommended that the Respondent be dismissed from employment by the School Board of Broward County.